ATLANTIC CITY

*v.*

ATLANTIC CITY STEEL PIER COMPANY.

[Filed July 10th, 1901.]

Upon the facts shown in this case—*Held*, that the easement deed made to complainant of the rights in question was not an escrow, but was absolutely delivered, and defendant was estopped from denying its efficiency.

*Messrs. Godfrey & Godfrey,* for the complainant.

*Mr. Allen B. Endicott,* for the defendant.

REED, V. C.

This suit is brought to restrain the defendant from selling commodities on its pier and from charging a fee for witnessing musical and other entertainments upon the pier other than a fee charged for entrance to the pier.

The city rests its case upon an easement deed made to it by the predecessor in title of the defendant.

In 1889 (*P. L. of 1889 p. 206*) an act was passed empowering cities located on or near the ocean embracing within their limits or jurisdiction any beach or ocean front, to lay out and open streets and driveways and to construct public walks along and upon the beach or ocean front and to grade and otherwise improve the same and to regulate the use thereof.

By a supplement to this act (*P. L. of 1890 p. 159*) it was provided that any walk constructed upon any such street so laid out should be elevated above the surface of the ground and be constructed on piling or other supports placed in the street; and when such elevated walk should be constructed, the city could permit approaches to be made to connect with it from contiguous property on the landward side or side most remote from

the ocean. By this act the city was authorized to accept any dedication of lands or rights which might be made for the purpose of enabling such city to open and lay out such street or for the purpose of constructing any such walk, or for the purpose of making any improvement in or to the same.

By another supplement (*P. L. of 1896 p. 18*) the common council of any such city was authorized to relocate, in whole or in part, any public walk or walks which may have been, or may thereafter be, constructed or built.

George W. Jackson, by two deeds from John F. Starr, one made on September 4th, 1884, and the other February 5th, 1894, got a title to a strip of land one hundred and fifty feet in width on the west side of Virginia avenue, running from a point distant one thousand two hundred and fifty feet from the centre line of Pacific avenue to the high-water line of the Atlantic ocean.

On April 30th, 1896, George W. Jackson, with many other beach owners, entered into an agreement with Atlantic City. By this agreement they dedicated to Atlantic City a right of way over their respective lands sixty feet in width. In the agreement the grantors covenanted as follows:

"We will not put or erect, or allow to be placed or erected, on the land hereby granted, or on the ocean side thereof, any building or structure except as by ordinance provided, and covenant that the above covenant shall run with the land; *provided*, that the grantors shall not be prohibited from building a pier in front of their property, and connecting the same to the new boardwalk about to be erected; and upon the further condition that the said pier shall be at least one thousand feet in length, extending into the ocean beyond the present sixty-foot strip, and constructed of iron or steel, and shall not permit the sale of any commodities upon the same, and be confined to the charging only an entrance fee."

The sixty-foot strip so dedicated by Jackson ran over this one hundred and fifty-foot lot conveyed to him by Mr. Starr. It was located above high-water mark. On October 7th, 1897, Jackson procured from the State of New Jersey the right to the land under water in front of his riparian property. On October 20th, 1897, Jackson conveyed the land which he had bought from Starr to the Atlantic City Steel Pier Company, and on January 4th, 1898, conveyed to the same company his riparian title.

The Atlantic City Steel Pier Company subsequently built a pier upon this property and attached the same to the boardwalk. To this pier the company has been accustomed to charge an entrance fee of ten cents. In addition it has charged for entrance to an enclosed hall upon the oceanward end of the pier where Innes' band played, an additional fee of ten, twenty-five or fifty cents. Additional fees were charged for reserved seats in another building where cake-walks and similar entertainments were held. It is insisted that these charges, other than the entrance fee, were made in violation of the covenants already displayed.

The main question is whether, assuming that the agreement is valid, the defendant has violated its terms by its charge of an entrance fee into the band-hall, and by its charge for reserved seats in certain portions of the amusement hall where the cake-walks occurred.

I am constrained to the conclusion that these charges are in violation of the terms of the agreement.

Reading the entire clause, not merely that part directed against the sale of commodities, but including the limitation in respect to what should be charged, the natural construction of the agreement seems to me to be that any additional charge for admission to any part of the pier, after the payment of the entrance fee, conflicts with the restriction which the grantors imposed upon themselves, namely, that they should be confined to charging only an entrance fee.

It seems too obvious for discussion, that the fees charged after the visitor has entered upon the pier are not entrance fees. If not, then the purpose of the agreement, as well as its literal words, forbid this collection.

It is said on the part of the defendant that the covenant contained in the proviso is an enabling and not a restrictive covenant. It is, however, perceived that the agreement itself contains a clear restriction against placing any obstruction upon the ocean side of the boardwalk. The proviso merely modifies the restriction by relieving the grantor from it, so far as to permit the building of a pier, of a certain length upon which certain things shall be done. The restriction is operative, except

in so far as the proviso relieves it of its operative force. The grantor, therefore, must show that its structure, in form and in use, comes within the exceptive words of the proviso.

It is again insisted by the counsel for defendant that the agreement is unenforceable, because it is *ultra vires.* This insistence is grounded upon the terms of the supplement of 1890, by which the city is authorized to accept any dedication for the purpose of enabling the city to open and lay out a street and build and improve a boardwalk. It is argued that while a dedication of the land upon which a boardwalk is to be built is within the power so granted to the city, an agreement in respect to other lands is entirely aside from the provisions of the act. The language of the act is broad. It does not confine the city to the acceptance of land upon which the walk is to be constructed. It may accept any land or rights for the purpose of making any improvement in or to the street or walk. But assume that the act is as narrow as the defendant insists, it cannot be successfully contended that Atlantic City, as trustee for the public, would not have the right to accept a dedication of lands for a public purpose without express legislative authority. Such a grant is effectual even without trustees. All the land oceanward of the boardwalk could have been dedicated by its owners as a park or boulevard, or public bathing ground, or for any other purpose. Now the agreement, as I construe it, contains a grant to the public of a right in the nature of an easement. It, indirectly by a negative covenant, grants a right of light, air and view over and across the oceanward land from the boardwalk. This right is limited by a reservation to the donors of the privilege of placing thereon a certain kind of structure. And the uses to which those structures shall be confined is defined, for the purpose of regulating the kind of structure and the number of structures which could be, and would likely be, erected. The owners have themselves limited the uses to which such structures may be put. Such a restricted grant, in my judgment, the city may accept, and, as the representative and trustee of the public, may invoke the judicial arm of the government to protect.

It is again urged that the defendant took title from Jackson

without notice of the restriction which Jackson had put upon the property by his dedication deed.

If the agreement, as recorded, was not constructive notice, it appears that Jackson himself was one of the organizers and principal stockholder, a director and treasurer, of the defendant company. It is absurd, under these conditions, to say that the defendant had not notice of the restriction; and it is upon the ground of notice that equity enforced these restrictive covenants against the grantee of the covenantor.

It is argued that the covenant imposed a burden upon Jackson's land which is illegal, and which, if legal, does not burden the land in the hands of Jackson's grantee.

The case of *Brewer* v. *Marshall, 3 C. E. Gr. 337; S. C. on appeal, 4 C. E. Gr. 537,* is invoked in support of this proposition.

In that case one who sold one piece of land bargained with his vendee that he, the grantor, would not sell any marl from his adjoining property. This covenant was held illegal because in restraint of trade; and it was held that even if legal and binding personally upon the grantor, one that would not run with the land into the hands of a purchaser, although such purchaser took title with notice of the covenant.

The covenant in the present case is, as already remarked, practically to secure an easement, and easements may be imposed upon the land by its owner and the burden of such imposition will run with the land.

Then, again, this covenant is one of many similar covenants entered into by a body of covenantors as part of a common scheme for the mutual advantage of each and all such covenantors. This feature, in my judgment, brings it within the exceptional class of cases discussed by Chief-Justice Beasley in *Brewer* v. *Marshall.*

It is again insisted that the restriction does not affect that part of the pier which is erected upon the land included in the riparian grant. In support of this contention, testimony was introduced to show that Jackson, when he took the riparian title, did so as trustee for the pier company, and conveyed the same to the said pier company on January 4th, 1898, without consideration.

I do not perceive how this fact, even if the deed should be so

reformed as to make Jackson a grantee in trust, would change the liabilities of the defendant.

The riparian license was but an incident of the ownership of the *ripa*. The covenant itself exhibited plainly that the acquisition of the state's license to wharf out beyond high-water mark was within the contemplation of the parties at the time of its execution. No pier one thousand feet in length from the boardwalk could be erected unless by the state's permission.

But again, the covenant not merely prohibits the placing of buildings upon the remaining land of the grantor, oceanward of the boardwalk, but provides that he will not erect, or allow to be erected, any building on the land granted or on the ocean side thereof—that is, anywhere oceanward, of the sixty-foot strip. When the license was obtained by the owner of the *ripa*—and it was obtainable only because he was such owner—the right was taken, in my judgment, subject to these restrictions.

But suppose that the right acquired from the state was free from the operation of the covenant? Jackson admittedly owned land between the boardwalk and ordinary high-water mark. Upon that land a portion of the pier connected with the boardwalk is built. He had no right to build that portion of the pier unless it was part of a structure one thousand feet long, upon which no commodities should be sold and to which an entrance fee only should be charged. Therefore, the existence of that part of the pier standing upon land above ordinary high-water mark is a violation of the covenant, because the grantor has not conformed to the requirements of the proviso.

The point is also taken by the defendant that there is incorporated in the dedication deeds a covenant or condition for the benefit of the dedicators, which is *ultra vires* and so beyond the power of the city to execute. The first of these is as follows:

"Whenever, because of the formation of land by accretion, the high-water line shall not be less than three hundred feet oceanward from the present location, the city council shall, upon the written request of the grantors owning not less than three contiguous squares of land, who shall have the right of way for such purpose, cause the same to be moved oceanward said three hundred feet or any less distance that such owners and city council may agree upon."

The act of 1896, page 18, section 2, invests the common council with power to relocate, in whole or in part, a public walk or walks which may have been constructed and built or may hereafter be constructed and built, &c.

Section 3 provides for the reconveyance of any land theretofore dedicated, upon the owners dedicating a new right of way. Aside from the fact that there has been no breach of this covenant, it appears that by the legislation of 1896, plenary power is conferred upon the city council to make the required change of location in accordance with the covenant.

There is also a covenant in the deed of dedication that the city council shall not grant a right of way to any railway company or street railway company over and along the same. What the word "same" refers to is indefinite, but presumably it refers to the right of way. This covenant is also said to be a nullity, but it seems to be a limitation of the dedicatory purpose entirely legitimate.

Again, the defence is interposed that it was represented to Mr. Jackson as an inducement for his execution of the dedicatory deed, that the deeds from all the other owners along the walk were to be obtained and that unless they were obtained, this deed would be a nullity.

Jackson says that some two weeks previous to his signing the deed, Judge Endicott and Judge Thompson came to see him and read over the easement deed. He says that he then refused to sign the same unless a clause was inserted permitting him to build a pier. Two or three weeks afterwards, he says, Judge Endicott came again and had the article about the pier inserted in the deed, and then he, Jackson, signed it. At that time, he says, Judge Endicott said to him, "we are getting everyone to sign this easement deed." That he, Jackson, replied, "If you don't get everyone to sign the easement deeds then I won't sign," and Judge Endicott replied, "If we don't get everyone to sign it, then it would not be worth anything."

Now it appears, as a fact, that two or three out of the numerous beach owners have failed to make similar deeds. The defence, it is perceived, rests not upon any condition inserted in the deed,

10

but upon a verbal statement alleged to have been made previous to their execution.

There is no insistence that any representation was fraudulently made as an inducement and there is nothing in the pleadings or testimony to support such a defence. The defence raised, if it has any substance, must stand upon the notion that the delivery of the deed to Judge Endicott was in escrow. Now, if Judge Endicott was the agent of the grantee, the deed was absolutely delivered.

Again, the conversation between Judge Endicott and Mr. Jackson, as detailed, seems to raise merely an expectation or promise that something in the future would be done. This is not a delivery in escrow. *Ordinary* v. *Thatcher, 12 Vr. 403.* That words of the kind stated were employed is, I think, entirely probable. I have no doubt there was a general understanding that the scheme required deeds from all the beach owners along the right of way. The ground-work of the scheme was a common surrender by such owners of a certain degree of control over their own property in consideration of the benefit that would accrue to them from similar conduct on the part of the other owners. If the complainant had attempted to hold the defendant to its covenant, while all or most of the beach owners refused to make similar deeds, it would have presented a case of hardship in the highest degree inequitable. But in this instance the scheme is substantially executed. Out of the very numerous beach owners, as already remarked, two or three only have not yet made their deeds. These owners, so far as appears, are not in the vicinity of the land of the defendant. The defendant has been silent while all the improvements have been made. It knew that the city was building upon the land in question by reason of the license which they had given in the deed. Under any aspect in which the facts can be viewed, it is now too late for the defendant to say that there was no delivery of its deed of dedication to the city.

I will advise a decree for the complainant.