J. A. JOHNSON, Appellant, v. S. A. ROBERTSON, Defendant, Appellee, CITY OF DES MOINES, and JOHNSON & MILLER COMPANY, Interveners, Appellants.

**Real property:** LEASES: ENFORCEMENT. One not a party to a lease
1  of real estate, in connection with which there is a building restriction agreement, is in no position to enforce the agreement.

**Same:** MUNICIPAL CORPORATIONS: STREETS: ADDED WIDTH: RIGHTS OF
2  CITY. Under an agreement of the owners of property abutting on a street to add to the width of the sidewalk in front of the property and not to erect buildings thereon, with no intention to dedicate the same but rather to hold it for the convenience of the owners, the use of the strip by the public will be deemed referable to the agreement with no right thereto in the city, except such as the agreement may confer; and such use will not ripen into a title or claim by prescription.

**Same:** EASEMENTS: THREATENED INTERFERENCE: INJUNCTION BY TEN-
3  ANT. An agreement of the owners to add a strip of their abutting property to the sidewalk space, and not to build thereon, constitutes a covenant running with the land and binding upon subsequent grantees; and a tenant entitled to the use and bene-

fit of such an easement has such an interest therein that he may enjoin anyone threatening to interfere with that use.

**Same:** SPECIFIC PERFORMANCE. Specific performance of a contract rests largely in the discretion of the court, and will be denied where enforcement would result in great hardship, not merely pecuniary loss; or where the party complaining has been guilty of laches, or has acquiesced in the doing of the thing of which he complains.

**Same:** BUILDING COVENANTS: RIGHTS OF TENANT. The owner of property for the benefit of which he has made building restrictions can not deprive his tenant of the right to such restrictions.

**Same:** ABANDONMENT OF RIGHTS: EVIDENCE. The owner or lessee of property, for the benefit of which building restrictions have been created, will not be held to have abandoned his right to enforce the same by permitting slight and immaterial violations of the agreement, so long as the right to enforce the same is of value to him, and such violations do not interfere with the substance of the agreement. In the instant case the showing is held insufficient to establish abandonment or waiver of the right to insist on the restrictions of a building covenant.

**Same:** ESTOPPEL. The fact that plaintiffs had used a small portion of the strip of land in controversy not strictly in accordance with the building covenant, by erecting thereon temporary show cases with permission of adjoining owners, and with the understanding that they were to be removed at any time in case of protest, did not estop them from claiming the right to enforce the covenant against the erection of a permanent structure covering practically the entire strip.

*Appeal from Polk District Court.*—HON. LAWRENCE DE GRAFF, Judge.

WEDNESDAY, APRIL 3, 1912.

SUIT in equity to enjoin defendant Robertson from erecting a building or in any way interfering with the free use of a four-foot strip of ground along the north side of a certain lot abutting upon Walnut street in the city of Des Moines. The city of Des Moines and the Johnson & Miller Company intervened in the suit, each

making some claim to the strip of ground. Upon issues joined, the case was tried to the court, resulting in a decree dismissing plaintiff's petition and the cross-petitions of the interveners and plaintiff, and the interveners appeal.—*Reversed* and *remanded.*

*R. O. Brennan, Carr, Carr & Evans,* and *O. M. Brockett,* for appellants.

*Howe & Lyon,* for appellee.

Deemer, J.—Walnut street in the city of Des Moines is one of the main business thoroughfares of the city. It runs west from the river and, as originally platted from the river to Fifth street, was eighty feet wide, and from Fifth street west was but sixty feet in width. F. M. Hubbell was a large owner of real estate on the south side of Walnut street between Fifth and Eighth streets, and at an early day proposed to the other abutting property owners on this street that the sidewalk be broadened from Fifth to Eighth street without changing the curb line. He took the matter up with one Clapp and other owners, and by paying Clapp either $100 or $200 secured an agreement from him and the other abutting owners between Fifth and Sixth streets to widen the sidewalk between these points. Thereafter he procured like agreements from the owners of property between Sixth and Seventh streets, and thereafter similar agreements among the property owners on the south side of Walnut street between Seventh and Eighth streets. Clapp set his building four feet back from the line, and, while other buildings were then on this four-foot strip when they were replaced by permanent structures, they were all set back four feet according to agreement. The various agreements were made some time prior to the year 1876, and every one abided by them for fifteen or twenty years. The property in question is between

Seventh and Eighth streets, and the agreement between the various interested property owners so far as material reads as follows:

Know all men by these presents, that we, William McClelland (unmarried), S. A. Robertson and Margaret P. Robertson, his wife, Elizabeth Dimmitt (widow), Charles H. Getchell and Rachael E. Getchell, his wife, all of the county of Polk and state of Iowa, for and in consideration of the advantages which will result to each and all of us who are owners of lots Nos. one (1) and two (2) and seven (7) and eight (8) in block No. two (2) of the original town of Fort Des Moines, now included in the corporate limits of the city of Des Moines, Iowa, do hereby mutually agree to and with each other and bind ourselves and appropriate, set apart and use for sidewalk purposes the following parcel of land, to wit:

A strip of ground four feet wide off the north side of lots Nos. one (1) and eight (8), in block No. two (2) aforesaid and running the whole length of said lots, and to that end we mutually agree to and with each other that in case we erect or cause to be erected upon said lots or any part thereof, any building or buildings after this date, will set said building four feet south of the north line of said lots, and upon the erection of such building or buildings, we will construct and thereafter maintain upon said strip of four feet of ground a good substantial sidewalk at the proper grade; and that said strip of four feet shall never be reclaimed for the purpose of erecting buildings thereon or be used for any other than sidewalk purpose except it be by the unanimous consent of all the owners of property in said lots Nos. one (1) and eight (8) expressed in writing, signed, sealed and acknowledged.

It is understood that said strip of four feet, or so much thereof as may be needed, may be used by the parties who own the property for stairways into their several basements, and for the display of goods, wares and merchandise; but it is not the intention of the parties hereto to dedicate said strip of ground to the city of Des Moines or to the public, but to hold it as private property, to be used as above stated and for our own convenience and profit.

S. A. Robertson, one of the parties to this agreement, is the defendant to this suit, and interveners Johnson & Miller Company are lessees of parts of lots 1 and 2 in block 2 of the city of Des Moines from Chas. Weitz. Weitz acquired title to that part of the property covered by the lease by certain *mesne* conveyances from one Dimmitt, who was a party to the agreement from which we have just quoted. The lease to the Johnson & Miller Company was made on September 1, 1906, for the term of ten years, and by the terms thereof the lessees were to use the premises for the conduct of a retail mercantile business, and for no other purpose. These premises were at that time, as now, covered by a one-story building, and this building abutted one immediately to the east, which was then, as now, owned by the defendant Robertson. Pursuant to the original agreement, the sidewalks were widened by the various property owners and made uniform through the blocks on the south side of Walnut street between Fifth and Eighth streets, and no permanent structures were allowed to encroach upon this four-foot strip save as will hereafter be noticed.

When defendant first constructed his building upon the lot now owned by him, the front was set back so as to leave this four-foot strip, but a step or approach to the building was with the consent of the board of public works of the city constructed upon this four-foot strip. This step was seven and three-fourths inches high and four feet wide and extended the full width of the building on Walnut street. This step remained there until he (Robertson) concluded to remodel his building some time in the fall of the year 1909, when he tore it out, and in place thereof was proposing to erect a large display window covering almost this entire four-foot strip, which window was to be fourteen or fifteen feet high, thirty-three and one-third feet wide, and four feet deep, save for an entrance into the store building near the center ten feet and nine

inches in width. Shortly after this improvement was commenced, plaintiff brought this action to enjoin the erection thereof. The city came into the case by intervention December 11, 1909, and the Johnson & Miller Company on January 30, 1911. Upon the presentation of the petition on October 14, 1909, to Hon. W. H. McHenry, one of the judges of the district court, he made the following order: "On reading the foregoing petition, it is ordered, this 14th day of October, 1909, that nine o'clock upon the 18th day of October, 1909, be fixed as the time for hearing the application for temporary injunction asked for in said petition, and that the said hearing be held at the equity courtroom in the courthouse of Polk county, Iowa, and the said defendant given notice of said hearing at least four days prior to said date."

The record also contains the following: "Said hearing was accordingly had, and at the conclusion thereof the court orally announced that an order should be entered for a temporary injunction as prayed; but no record of such order was made, and no such writ ever in fact issued."

The case came on for final hearing on March 15, 1911, and was finally disposed of on the 16th of that month, the decree being in favor of Robertson.

Plaintiff bases his right of action upon the lease hitherto mentioned, and claims that he is entitled to the injunction prayed because of the agreement made by the property owners in the year 1876. He makes no other claim, and it is manifest from the statement already made that he is not a lessee of the premises, and that he is in no position to ask for an injunction.

1. REAL PROPERTY: leases: enforcement.

The intervener city claims that the four-foot strip is a part of Walnut street acquired through dedication or by prescription, and that it is entitled to maintain this action to prevent the obstruction of the street. The Johnson & Miller Company as lessees from Weitz claims that it is

entitled to a decree restraining the erection of the structure on the four-foot strip by reason of the original agreement of the property owners, and for the further reason that the structure constitutes a nuisance in that it obstructs Walnut street in such a manner as to cause it special damages. This last proposition is bottomed upon the thought that this four-foot strip is either a public right of way that is a part of Walnut street, or a private way by agreement, and that in either event it is entitled to such a decree as will preserve its use either as a private or public way. Defendant Robertson interposed many defenses; among other things he claims (1) that plaintiff has no such interest in the controversy as entitles him to any relief; (2) that the city has no interest in the strip, either by dedication or prescription; (3) that the only right of the Johnson & Miller Company is a contractual one based upon its contract of lease, and that as lessee it has no right of action save against its lessor, and no right to an injunction restraining the erection of the improvement; (4) that the present owners of the building, the heirs of the Chas. Weitz estate, he (Weitz) being dead, were and are the contractors who were making the improvement for Robertson, and that for this reason they are estopped from claiming any relief against defendant; (5) that the original agreement with reference to the use of the four-foot strip has been abrogated by reason of material violations of the parties thereto and by mutual acquiescence; (6) that the remodeling of the building was in strict accord with the terms of the original agreement; (7) that by standing by and seeing the improvements made without objection the Johnson & Miller Company are estopped from claiming that they were not in accord with the original agreement; and (8) that in any event the Johnson & Miller Company being mere lessees is not entitled to any other order than will protect its rights during the term

of its lease, and as this expires soon it has no other remedy than action against its lessor.

As has already been observed, plaintiff has not shown himself entitled to any relief, and the trial court was right in dismissing his petition.

As to the city, we do not think it ever acquired any right to the strip, save under the original agreement. The use made of the strip must have been under this agreement and is referable to it; and no such showing is made of use in hostility to this agreement or to the rights or claims of the parties thereunder as would make this strip a part of Walnut street, either by dedication or prescription. It is fundamental, of course, that, whatever the use, it will be presumed to have been under the agreement and not in hostility thereto. And as there was no express dedication to the city none will be inferred from mere use alone. Again mere use which will be presumed to have been referable to this agreement will not ripen into a title or claim by prescription. Under well-established rules it is clear that the city has no cause for complaint. The only real questions in the case relate then to the issues between the Johnson & Miller Company and the defendant, Robertson. It is contended that this company is a stranger to the original agreement; that it was not made for its benefit; and that it has no right in any event to complain of a breach thereof.

2. SAME: municipal corporations: streets: added width: rights of city.

It is true, of course, that it was not a party to the original agreement, but this agreement manifestly was a building or restrictive covenant, running with the land (*Sexauer v. Wilson*, 136 Iowa, 357; *Evans v. Pier Co.*, 67 N. J. Eq. 315 (58 Atl. 191; Id., 67 N. J. Eq. 620, 59 Atl. 1117); *City v. Pier Co.*, 62 N. J. Eq. 139 (49 Atl. 822)), and of course passed with the land into whosesoever's hands the title might pass. Had the Johnson &

3. SAME: easements: threatened interference: injunction by tenant.

Miller Company received a conveyance of the land from their lessor Weitz, instead of a lease, there would be no doubt of their right to enforce the agreement or covenant by appropriate action even against a grantee of Robertson having notice of the agreement. Robertson was one of the parties to the original agreement, hence the question of notice to him is not in the case, and the fundamental proposition here is, May a lessee from one of the parties to the agreement—the owner of a chattel real, who holds part of the property covered by the original agreement for a specific purpose, to wit, for the conduct of a retail merchandising business—enforce this building agreement? Upon this fundamental and vital question we have not been cited to any authorities which seem to be directly in point. The proposition is not free from doubt, and in the absence of direct authority, although doubtless many cases may be found upon extended search, we shall be obliged to resort to general principles for its solution. Of course, if the action were for mere breach of covenant, and the tenant's possessory rights were not directly disturbed, no doubt no one but the owner of the land could complain; for when we say that certain covenants run with the land, we mean primarily that they follow the title, and that action may be brought for breach thereof by him who holds the title.

Ordinarily a tenant for years has no title to the land and he has no right to enforce any of the covenants made in any of the deeds which constitute the chain of title. But for some purposes a tenant is in privity with his landlord (*Allen v. Culver*, 3 Denio (N. Y.) 295; *Lincoln v. Burrage*, 177 Mass. 378 (59 N. E. 67, 52 L. R. A. 110); *Parker v. Nightingale*, 6 Allen (Mass.) 341 (83 Am. Dec. 632)), and may maintain an action against any one who interferes with his possessory right. If we find, then, that these building restrictions or agreements create an estate or easement in the land or appurtenances there-

to, then it would seem to follow that a tenant of one of the parties might bring action in his own name against even a stranger who was threatening or who proposed to deprive him of the use of this easement or appurtenance. The first inquiry, then, in the solution of this problem is the effect of such building restriction covenants or agreements; for, as has been intimated by learned writers, the mere fact that a covenant may be said to run with the land does not solve the problem.    The effect of such agreements has been the subject of many decisions, and courts and text-writers have had some difficulty in assigning them to a proper place in our system of jurisprudence. A learned text-writer has thus stated the law on this subject:

Even in some of the jurisdictions where, as in England, the burden of a covenant does not run with the land, an agreement as to the use of land may, under certain circumstances, affect a subsequent purchaser of the land who takes with notice of the agreement; equity in such case enjoining a use of the land in violation of such agreement.    As stated in the leading case on the subject, 'the question is not whether the covenant runs with the land, but whether a party shall be permitted to use the land in a manner inconsistent with the contract entered into by his vendor, and with notice of which he purchased.'    The person thus affected by the agreement as to the use of the land may be a purchaser, a lessee, or even, it has been decided, a mere occupant of the land.    There is some difficulty in explaining this doctrine so far as it involves an enforcement in equity of rights which are denied at law, and in some cases in this country the right to relief in equity in such a case seems to be based, not on the English theory of relief against a purchaser with notice, but on the theory that, by the covenant, an easement is created.    This latter theory is, however, itself unsatisfactory in some respects, and is insufficient to explain all the cases in which relief has thus been granted against an assignee of the land. (Section 348, vol. 1, Tiffany on Real Property.)

In England, an agreement will thus be enforced in

equity against a subsequent purchaser or occupant only when it is restrictive of the use of the land, and not when it calls for the performance of some positive act by the occupant thereof. In this country, occasionally, an agreement not restrictive in its nature has thus been enforced. In the great majority of cases, however, the agreement enforced has been restrictive. Thus, agreements not to use land for building, or for a particular business, or for other than residence purposes, are thus enforceable, as are agreements not to build within a certain distance of the street, or to erect no building of less than a certain cost, or of a style of construction other than that named. According to a few decisions, the agreement, even though restrictive, in order to be thus enforced against a subsequent purchaser, must 'touch and concern' the land in favor of whose owner the agreement is made, by tending to the physical advantage of such land, it being insufficient that it increases its value indirectly by preventing the use of the adjoining property for a competing business. In England and New York, however, a different view apparently prevails. The right to thus enforce an agreement against a subsequent purchaser on equitable principles is, at least in some jurisdictions, independent of the mode or incidents of its execution. It need not be a covenant—that is, an agreement under seal—and it is sufficient if it be oral, or merely inferred from certain representations made upon the sale of land. (Section 349, vol. 1, Tiffany on Real Property.)

The purchaser of a tract can enforce an agreement restrictive of the use of another tract made with the former owner of both tracts only if the agreement was originally intended to inure to the benefit of any such purchaser, or, in other words, was intended to benefit the land rather than the promisee personally. Consequently a vendee of a tract of land, seeking to enforce such an agreement against a vendee from the same person of an adjoining tract, must show that the agreement was so intended, and this he may do by evidence as to the situation and condition of the property and the surrounding circumstances. An intention that purchasers shall enjoy the benefit of the agreement is, it seems, invariably presumed from the fact that the lots purchased were laid off for sale as building

lots, with no intention on the part of the purchaser so laying them off to retain any portion of the property for his own enjoyment. According to the English cases, the restriction must have been actually entered into the subsequent purchase—that is, the purchaser must, as it were, have purchased the right to take advantage of the agreement. (Section 351, vol. 1, Tiffany on Real Property.)

Another writer has said:

The rights created by restrictive covenant and agreements are frequently spoken of as easements; and, while the method of creating these rights and the limits within which courts of equity enforce them differentiate them from ordinary easements, yet the fact that courts restrict them to a negative character, and demand, in order to fasten them upon land, that they must be imposed for the advantage of other neighboring lands, requiring in a word a servient and a dominant tenement, brings them into close analogy with true easements. Nor is the fact that they are created by covenant a negation of this character, for an easement may be created by words of covenant as well as by words of grant; and it is not necessary that the rights should be created at the time that the dominant or servient estate is conveyed. It has been denied, however, that these rights can satisfactorily be considered as easements, and courts of equity usually speak of them as negative or equitable easements, or simply as equities or amenities. (Am. & Eng. Ency. of Law, vol. 5, pages 4 and 5.)

Building restrictions and other limitations on the use of property of a character which the law permits to be attached to land in such a sense as to restrict the use of one parcel thereof in favor of another will be enforced in courts of equity upon equitable grounds, in favor of and against the parcels designed to be benefited or burdened by the restriction in whosesoever hands the parcels may be, without regard to whether the restriction is a covenant running with the land, or even, it would seem, without regard to whether the right created can be properly considered in the nature of an easement, provided that the person in possession of the parcel subject to the burden of the restriction took it with notice thereof, either actual

or constructive. When a lot has been sold subject to such a restriction, the price is presumed to have been affected thereby, 'and nothing could be more inequitable than that the original purchaser should be the assignee being allowed to escape from the liability which he had himself undertaken.' . . . The vital question in these cases is not whether there is a covenant running with the land, but whether the restriction was imposed upon the servient estate for the benefit of the land in behalf of which it is sought to be enforced. Whether the restriction was so imposed, or was merely a personal contract for the benefit of the vendor, is to be determined, generally, by the fair interpretation of the grant or reservation creating it, aided, if necessary, by reference to the situation of the property and the surrounding circumstances. . . . The great majority of cases wherein these principles are applied are those where a tract or estate is sold in lots or parcels, and covenants are exacted from the several purchasers imposing restrictions upon the use of the lots sold in pursuance of a general plan for the mututal advantage of all the parcels. In such cases, the restrictive covenants entered into between the first purchasers and their common vendor may be enforced by the purchasers or their assigns, without regard to the priority of title between the parties. . . . In England the rule is well established that a court of equity will only enforce, in accordance with the principles laid down in this title, negative covenants and agreements, and will not enforce covenants to do positive acts relating to land or requiring the expenditure of money, thus drawing the line as to the enforcement of these restrictions as it would run where the rights created by them considered as easements. But in the United States equity has lent its aid to enforce agreements to do positive acts. (Am. & Eng. Ency. of Law, vol. 5, pages 9–15.)

In *Parker v. Nightingale,* 6 Allen, 341 (83 Am. Dec. 632), the Supreme Court of Massachusetts said:

A court of chancery will recognize and enforce agreements concerning the occupation and mode of use of real estate, although they are not expressed with technical accuracy, as exceptions or reservations out of a grant not

binding as covenants real running with the land. Nor
is it at all material that such stipulations should be bind-
ing at law, or that any privity of estate should subsist
between parties in order to render them obligatory, and
to warrant equitable relief in case of their infraction.
A covenant, though in gross at law, may nevertheless be
binding in equity, even to the extent of fastening a servi-
tude or easement on real property, or of securing to the
owner of one parcel of land a privilege, or, as it is some-
times called, 'a right to an amenity' in the use of an
adjoining parcel, by which his own estate may be en-
chanced in value or rendered more agreeable as a place
of residence. Restrictions and limitations which may be
put on property by means of such stipulations derive their
validity from the right which every owner of the fee has
to dispose of his estate either absolutely or by a qualified
grant, or to regulate the manner in which it shall be used
and occupied. So long as he retains the title in himself,
his covenants and agreements respecting the use and en-
joyment of his estate will be binding on him personally,
and can be specifically enforced in equity. When he dis-
poses of it by grant or otherwise, those who take under
him can not equitably refuse to fulfill stipulations con-
cerning the premises of which they had notice. It is upon
this ground that courts of equity will afford relief to
parties aggrieved by the neglect or omission to comply
with agreements respecting real estate after it has passed
by *mesne* conveyances out of the lands of those who were
parties to the original contract. A purchaser of land,
with notice of a right or interest in it existing only by
agreement with his vendor, is bound to do that which his
grantor had agreed to perform, because it would be un-
conscientious and inequitable for him to violate or dis-
regard the valid agreements of the vendor in regard to
the estate, of which he had notice when he became the
purchaser. In such cases it is true that the aggrieved
party can often have no remedy at law. There may be
neither privity of estate nor privity of contract between
himself and those who attempt to appropriate property
in contravention of the use or mode of enjoyment im-
pressed upon it by the agreement of their grantor, and
with notice of which they took the estate from him. But

it is none the less contrary to equity that those to whom
the estate comes, with notice of the rights of another re-
specting it, should wilfully disregard them, and, in the
absence of any remedy at law, the stronger is the neces-
sity of affording in such cases equitable relief, if it can
be given consistently with public policy and without vio-
lating any absolute rule of law.    These principles were
fully explained and applied by this court in the recent
case of *Whitney v. Union Railway,* 11 Gray (Mass.) 359
(71 Am. Dec. 715), and are constantly acted upon by
the court of chancery in England and by the courts of this
country exercising equity powers.    *Mann v. Stephens,*
15 Sim. 377; *Tulk v. Moxhay,* 11 Beav. 571, and 2
Phillips R. 774, and 1 Hall De G. Macn. & Gord. 1,
and 1 Kay. 56; *Piggott v. Stratton,* De G., Fisher &
Jones, 33. . . .

This brings us to a consideration of the most im-
portant and difficult question raised by the demurrer,
which is whether the present plaintiffs, or any of them,
set forth in the bill any such claim or title as will enable
them to enforce this restriction on the use and occupation
of the premises in controversy as against the defendants.
A satisfactory answer to this inquiry will, we think, be
found in the fact, which is sufficiently apparent from the
allegations in the bill that the purpose intended to be
accomplished by the restrictions inserted in the deeds of
the estate now owned and occupied by the defendants was
for the benefit and advantage of other owners of lots sit-
uated on the same street or court.    Indeed, it could have
been designed for no other purpose.   If we lay aside all
the facts alleged in the bill which rest in parol evidence
only, and look exclusively to the history of the title as
shown by the deeds, the conclusion is unavoidable that
the original grantors, in whom the title to the entire tract
now owned by the several parties to this suit in different
parcels was vested, intended, by limiting the use of the
several lots and prescribing the kind of structures which
are to be erected by the grantees thereon, to establish a
permanent regulation and restriction by which to prevent
each parcel from being appropriated to a purpose which
might inure to the injury of any other parcel or render
it less agreeable as a place of residence.    By excluding

all erections for the purposes of trade, and appropriating each lot to a prescribed use as a dwelling house, the entire neighborhood comprised within the limits of the original tract laid out for a street or court was secured against annoyances arising from occupations which would impair the value of the several lots as places of residence. Thus a right or privilege or amenity in each lot was permanently secured to the owners of the other estates. That this restriction or limitation was not imposed by the original grantors for their own benefit or advantage, and can not be considered as personal to them, is manifest from the fact that they retained no right or interest in any of the parcels of land. The whole tract was conveyed by them. It does not appear that they retained the occupancy or ownership of any of the lots or of any adjoining estate by means of which they could derive any personal benefit or advantage from the restrictions. But, even if they had, it would not change the result; because by uniting in a scheme or joint enterprise for the division of the estate into lots or parcels on a street or court laid out by them, and annexing to the conveyance of each lot a restriction on its use, by the observance of which each parcel would be occupied for a similar purpose with every other, the legal inference is, in the absence of any evidence to the contrary, that the intention was to secure to each estate the benefit or advantage which might arise from the specific mode in which the adjoining premises were to be improved and occupied. The effect of such a restriction inserted in contemporaneous conveyances of the several parcels under the circumstances alleged in the bill, was to confer on each owner a right or interest in the nature of a servitude in all lots situated on the same street which were conveyed subject to the restriction. Thus it entered into the consideration which each purchaser paid for his land, either by enhancing its price in view of the benefit secured to him in the restraint imposed on adjoining owners or by lessening its value in consequence of the limitation affixed to its use. In this view of the case, it is quite immaterial to determine the precise legal nature or quality of the restriction in question. In strictness, perhaps, the right or interest created by the restrictions, being a qualification of the fee, did not pass out of the original

grantors, and now remains vested in them or their heirs. But, if so, they hold it only as a dry trust, in which they have no beneficial use or enjoyment, the entire usufruct being in their grantees and their assigns now holding the estates for whose use and benefit it was intended. Such being the case, then the latter are proper parties to enforce the restriction; and the former, not having any present interest in it, need not be parties to the proceeding. The same result would follow if the restriction be construed as in the nature of a covenant by each grantee with the other owners of estates on the court, or others holding under a similar restriction. . . .

Looking at the merits of the case as disclosed by the bill, it seems to us that the plaintiffs are entitled to maintain their bill to enforce the restriction by enjoining the use of the premises for the purposes for which they are alleged to be occupied by the defendant Loeber.

The same rule was announced in *Hubbell v. Warren,* 8 Allen (Mass.) 178; *Whitney v. Union Ry. Co.,* 11 Gray (Mass.) 359 (71 Am. Dec. 715); *Wolfe v. Frost,* 4 Sandf. Ch. (N. Y.) 72; *Tallmadge v. E. River Bank,* 26 N. Y. 105; *Green v. Creighton,* 7 R. I. 1; *Gibert v. Peteler,* 38 Barb. (N. Y.) 488. In the latter case it was said: "The action of courts of equity in such cases is not limited by rules of legal liability and does not depend upon legal privity of estate, or require that the party invoking the aid of the court should come in under and after the covenant. A covenant or agreement, restricting the use of any lands or tenements in favor of or on account of other lands, creates an easement, and makes one tenement, in the language of the civil law, servient, and the other dominant, and this without regard to any privity or connection of title or estate in the two parcels or their owners. All that is necessary is a clear manifestation of the intention of the person who is the source of title to subject one parcel of land to a restriction in its use for the benefit of another whether that other belong at the time to himself or to third persons, and sufficient language to

make that restriction perpetual." The English cases seem to be to the same effect: *Western v. McDermott,* L. R. 1 Eq. Cas. 499; *Coles v. Sims,* 5 De G. McN. & G. 1; *Piggott v. Stratton,* 1 De G. F. & Jones, 33; *Tulk v. Moxhay,* 1 H. & Tuells, 105; s. c., 11 Bevan, 571.

From these decisions it will be observed that these building restrictions or agreements, particularly where negative in character, create equitable easements, amenities, or servitudes, and that they may be enforced by any one. interested in the property without regard to privity either of contract or estate and no matter whether the covenant may be said to run with the land or not. It follows, then, that a tenant who is entitled to use this easement may bring a suit in equity to enjoin any one who is threatening to interfere with that use.

II.    The Johnson & Miller Company having the right to sue to protect itself in the right to the free use of the property with all its amenities and appurtenances, we are.

**4. SAME: specific performance.**

next to inquire whether any of the special defenses pleaded have been established. Among other things it is said that the right is an equitable one which will not be granted as of course, but only because there is such a showing as in good conscience entitles it to the relief claimed, and that there has been no abandonment of the right to enforce the agreement; no laches and no such acquiescence in what has been done as to deprive the tenants of their right to exact compliance with the covenants.

It is true, of course, that the specific performance of such contracts like those relating to contracts affecting real estate in general rests largely in the sound discretion of the court, and if the defendant will be subject to great hardship, or the consequences would be inequitable, relief will be denied. *Columbia College v. Thacher,* 87 N. Y. 311 (41 Am. Rep. 365); *Conger v. New York R. R. Co.,* 120 N. Y. 29 (23 N. E. 983); *Parker v. Nightingale,*

*supra.* But mere pecuniary loss to the defendant from a specific performance of such a restriction will not prevent a court of equity from enforcing it. *Hall v. Wesster,* 7 Mo. App. 56.

Of course the party complaining must not be guilty of laches, nor may he be in the position of having acquiesced in the breach. *Payson v. Burnham,* 141 Mass. 547 (6 N. E. 708); *Jackson v. Stevenson,* 156 Mass. 502 (31 N. E. 691, 32 Am. St. Rep. 476); *Whitney v. Union R. R. Co.,* 11 Gray (Mass.) 367 (71 Am. Dec. 715); *Ware v. Smith,* 156 Mass. 186 (30 N. E. 609).

But a landlord, having leased the property, can not after the execution of the lease deprive his lessee of the benefits of the covenants. *Piggott v. Stratton,* 1 De G. F. & J. 33 (6 Jur. (N. S.) 129). *Raynor v. Lyon,* 46 Hun (N. Y.) 227; *Landell v. Hamilton,* 177 Pa. 23 (35 Atl. 242).

5. SAME: building covenants: rights of tenant.

There is nothing in the case to show that the Johnson & Miller Company ever acquiesced in the breach of the agreement since it became a tenant of the property, and it commenced its suit against the defendant, or the action was brought by one of the members of that corporation, before Robertson had completed his improvement. This was the only breach which in any measure directly affected the property which they have leased. They have also pressed the suit with sufficient diligence, and should not be held guilty of laches.

The defendant also relies upon an estoppel due to the fact that one or more of the heirs of the Weitz estate was the contractor who had the building of the encroachment complained of, and that by reason of having part in this work, they not only estopped themselves, but also their tenant, from claiming a breach. To this there are two answers: In the first place, having rented the property to the Johnson-Miller Company, they could not destroy the equitable easement in their favor by conduct, and in

the next place there was no such showing of acquiescence on the part of any of the heirs of the Chas. Weitz estate as would amount to an estoppel. Indeed, there is nothing to show that the contractors who did the work for Robertson were any of them the heirs of the Weitz property.

The main defense relied upon, however, is abandonment or mutual abrogation of the agreement by the parties thereto or their privies. Of course there may be such conduct upon the part of the parties to the agreement or their grantees as would amount to an abandonment. This is established by a long line of authorities commencing with the celebrated case of *Duke of Bedford v. Trustees of the British Museum,* 2 Mylee & Keene, 552, and running down to *Hensley v. Marlborough Hotel Co.,* 62 N. J. Eq. 164 (50 Atl. 14; s. c., 63 N. J. Eq. 804, 52 Atl. 1132), and perhaps later cases. There is a conflict in the cases as to what will amount to an abandonment which is pointed out in the comprehensive note to *Brown v. Huber* (Ohio) 28 L. R. A. (N. S.) 705. That case also deals quite extensively with most of the propositions here involved, and we call especial attention to it because of the valuable note appended. There are also other annotations well worthy of attention in 1 Ann. Cas. 601, and 14 Ann. Cas. 760-1021.

Whether or not there has been a mutual abandonment is a question of fact rather than of law, although the better doctrine, we think, is stated in *Payson v. Burnham,* 141 Mass. 547 (6 N. E. 708); *Rowland v. Miller,* 139 N. Y. 93 (34 N. E. 765, 22 L. R. A. 182), and other cases to the effect that if the other erections did not interfere with plaintiff's rights he will not be held to have acquiesced when one of the parties to the agreement or his grantee proposed to do that which would result in indirect injury to his property. In other cases it is said that acquiescence in the breach of such a covenant by other grantees will not deprive a lot owner of the right to enforce a restric-

6. SAME: abandonment of rights: evidence.

tive covenant so long as it remains of any value to him. *Lattimer v. Livermore,* 72 N. Y. 174.

Again, in *Hyman v. Tash* (N. J. Ch.) 71 Atl. 742, it is said in effect that violation of building restrictions will not prevent their enforcement if the violations are immaterial and such as do not prevent the general plan from being carried out. See, also, *Bowen v. Smith,* 76 N. J. Eq. 456 (74 Atl. 675).

The English cases generally hold that a person entitled to enforce a restrictive covenant may take no notice of violations not especially offensive to him without losing the right to enforce the restrictions in case of an especially offensive violation (*Knight v. Simmons,* 2 Ch. 294; *Osborne v. Bradley,* 2 Ch. 446; *Weston v. McDermott,* L. R. 2 Ch. Eng. 75), and the courts of this country have also adopted this rule. *Barton v. Slifer,* 72 N. J. Eq. 812 (66 Atl. 899); *Rowland v. Miller,* 139 N. Y. 93 (34 N. E. 765, 22 L. R. A. 184); *Brigham v. Mulock Co.,* 74 N. J. Eq. 287 (70 Atl. 185); *Bowen v. Smith,* 76 N. J. Eq. 456 (74 Atl. 675); *McGuire v. Caskey,* 62 Ohio St. 419 (57 N. E. 53).

In the latter case it is held in effect that plaintiff's submission to violations of a building line restriction, most of which were upon portions of the street remote from his premises, which violations did not substantially affect the enjoyment of his own property, did not operate as a waiver of his right to object to other encroachments by which such enjoyment would be materially impaired. In another case it was held that the erection of front steps over a building line and ornamental projections made without objection would not estop a party from enforcing a building-line agreement. *Tripp v. O'Brien,* 57 Ill. App. 407. See to the same effect and quite in point here *Bacon v. Sandberg,* 179 Mass. 396 (60 N. E. 936). Also the following to the same point: *Payson v. Burnham,* 141 Mass. 547 (6 N. E. 708); *Steward v. Finklestone,* 206 Mass.

28 (92 N. E. 37, 28 L. R. A. (N. S.) 634, 138 Am.
St. Rep. 370); *Brigham v. Mulock Co., supra; Morrow
v. Hasselman,* 69 N. J. Eq. 612 (61 Atl. 369); *Waters.
v. Collins* (N. J.) 70 Atl. 984; *Adams v. Howell,* 58
Misc. Rep. 435 (108 N. Y. Supp. 945).

So much as to the law. Now the most that can be
claimed for the testimony upon this proposition is that
defendant erected the step to his building to which we have
referred; that more than twenty-five years ago steps were
built upon this four-foot strip leading to Foster's Opera
House, which was upon a lot near to that occupied by
the Johnson-Miller Company; that steps were also erected
leading to the Masonic Temple upon this four-foot strip
which is in the same block as the Weitz property; that
the front of a drug store in the opera house building at
the northwest corner of the block in which the property
in question is situated was extended over and upon this
step. It was also shown that showcases were permitted to
remain upon this strip, and that at the east end near Fifth
street a front has been extended over part of the strip.
But the testimony also shows that almost without excep-
tion the walls of the buildings themselves and the projec-
tions which came to the street line, save the steps referred
to, have been with reference to the line established by
the agreement. This is the general rule as to property
upon the entire strip. Under such circumstances we do
not think there was either an abandonment or abrogation
of the building restriction either by Johnson & Miller
Company or by its lessor. None of the claimed encroach-
ments in any way interfered with their use and enjoyment
of this property, whereas the testimony shows that the
construction complained of will be a serious loss to them
in that it shuts off a view of their show windows by those
who use the sidewalk. This showing is sufficient to entitle
them to relief because it is an interference with the equit-
able easement to which they are entitled.

III.   Lastly it is contended that the Johnson-Miller Company is not entitled to any relief because it has used the strip for other purposes than those contemplated by the agreement by maintaining a display case or cases upon part of the strip.   These were shown to be small cases about eighteen· by twenty-two inches, and something like four feet high, and did not, as we think, seriously interfere with other property on this side of the street.   The maintenance of these should not, we think, estop the company from complaining of the obstruction which defendant is threatening to build or has built.

7. SAME: estoppel.

Again it was shown that these display cases were put up by permission of the property owners with the understanding that they were to be removed at any time there was a protest.   They were temporary affairs, screwed to the wall by little brackets and were easily removed.   Again the original agreement permitted the use of the strip for these purposes.   We think there should have been a decree of injunction as prayed which would protect the Johnson-Miller Company during the term of their lease—not for all time for their lease expires in the year 1916, and this action is not for the owner of the fee.   If he or they be content with the arrangement, well and good; but they can not after having leased the property deprive the lessor of the uses and benefits thereof.   Whether or not the Weitz heirs will ever be entitled to an injunction, we need not now determine.   The only decree which should be entered here is one which will protect the tenants in the full enjoyment of the property during the term of their lease. That this is the proper relief in such cases, see *Simper v. Foley*, 2 Johns & H. 555.

The decree must and it is reversed, and the cause remanded for one in harmony with this opinion.—*Reversed and remanded*.