## Foos v. Engle et al.

June 18, 1943.

Carl F. Eversole and John Noland, and O'Rear & Prewitt for appellant.

H. O. Porter for appellees.

OPINION OF THE COURT BY JUDGE TILFORD—Affirming in part and reversing in part.

The appellees, individually, are the owners of residences in what is known as Wellington Subdivision in the City of Richmond. Appellant is the owner of five lots Nos. 42, 43, 44, 45 and 46.

The object of this action, instituted by appellees, was to enjoin appellant from maintaining a "trailer camp" on Lots 44, 45, and 46, and from erecting a one-story frame structure on Lot 43 to be used as a bathhouse and toilet in connection therewith. The Chancellor decided that Lots 44, 45, and 46 were not covered by the building restrictions which appellees sought to enforce, but that Lots 42 and 43 were. Accordingly, he enjoined the erection of the bathhouse and toilet on Lot 43 but declined to enjoin the use of Lots 44, 45, and 46 for a trailer camp. Appellees, by cross-appeal, seek a reversal of so much of the judgment as holds that the use of Lots 44, 45, and 46 is not subject to restriction. Appellant, of course, complains only of so much of the judgment as restricts her use of Lot 43.

The questions involved are not without difficulty, and their solution requires a somewhat extended review of the facts. Prior to August 29, 1928, the property, now comprised within the Subdivision and consisting of a residence and 8.26 acres, was owned by appellant and two of her aunts, and was heavily encumbered by a mortgage to the Louisville Title Company. On that date the three owners conveyed the property in trust to the Consolidated Realty Company "for the purpose of subdividing and

selling said property at public auction on such terms, conditions, and stipulations as it may deem to the best interest of all concerned,'' and upon the condition that there should be executed, simultaneously with the deed, a contract, whereby the Realty Company would ''undertake to plat and sub-divide the herein above described property for the purpose of selling the same at Public Auction through its Auction Department at a date to be agreed upon between the parties hereto.'' The contract was executed as stipulated, and contained, in addition to other details, the following:

''The parties of the second part agree to immediately take charge of said land, sub-divide and plat same into lots, streets and alleys in such manner as in its opinion may seem best, and thereafter and on or before October 1, 1928, it will sell same at public auction to the highest and best bidder or bidders on such terms and conditions, including stipulations, restrictions and reservations as to the use of the land as in its judgment may seem best.  *  *  *

''It is agreed that Lots 36, 37, 38 and 39 as shown on plat, which front 169.5 on the north of a new court 125 feet on the west side of Third Street are hereby reserved and excluded from said sale. Also excluded is a lot directly north of said lots fronting along Third Street.

''Provided, however, that the sale of the remaining lots in said property which shall be offered first, shall have realized a sufficient sum to pay the indebtedness due the Louisville Title Company and any other indebtedness against said property, and also to pay the commission of the parties of the second part as hereinafter provided for, on all of the lots sold up to that time. In the event the sale of such lots shall not realize enough to pay such encumbrances and commission of second parties then second parties shall have the right to offer for sale any of the lots above reserved.

''It is agreed in the event said property does not have to be sold, that said Trustee will have the property surveyed and divided into six lots, three of which shall front on the new court as shown on new plat and three front on Third Street. Second parties agree to deed two of said lots to each Lillian

Theophanis, Belle Walker, and Jennie Walker Held upon written request at the close of sale by the interested parties. It is agreed by the second parties that there is to be no commission and no charge of any kind for the handling of said six lots, except as above provided.

"Also graveyard lot is to. be excluded and deeded without charges equally to the above three parties mentioned. * * *

"It is further agreed that in addition to the hereinabove referred to restrictions, stipulations and reservations, that the improvements on the lots fronting on Lancaster Avenue shall cost not less than $4000.00;

"That the lots in the court facing Lancaster Avenue, when improved, the improvements shall cost not less than $4000.00; and the improvements on all other lots in the court shall cost not less than $3500.00, except the improvements on the lots fronting west on the East side of Third Street shall cost not less than $3000.00. The lots on Second Street will be conveyed without building restrictions."

It should be explained that the property conditionally reserved from sale by the terms of the contract was designated on the plat prepared and recorded by the Realty Company as Lots 41, 42, 43, 44, 45, and 46. It should also be noted that the deed referred to was immediately recorded, but that the contract never was. In order that conveyances might be made to the purchasers at the auction sale, the deed of trust to the Realty Company, as well as the previously executed deed of trust to the Title Company to secure its indebtedness, were rescinded, and the three joint owners again conveyed the property to the Realty Company, this time, by an absolute deed which recited:

"Whereas, the property above described has been subdivided into lots, and streets and alleys created and dedicated to public use, by the second party, acting as Trustee under deed dated August 29, 1928, and recorded in the office aforesaid in Deed Book 105, page 6, and designated as Wellington Place, on a plat of the said Subdivision filed by said Consolidated Realty Company, Trustee, in the office aforesaid, dated and recorded in Plat Book 1, page 33,

and said subdivision of said property, and said plat are hereby approved, confirmed and adopted by the parties hereto."

Enough was raised at the auction sale to discharge the indebtedness without selling the property conditionally reserved to the owners by the contract of August 29, 1928, and accordingly, on November 1, 1928, the Realty Company conveyed to appellant two of the six lots into which the reserved property had been platted, Lots 41 and 45, the deed reciting:

"As a further consideration for this conveyance the party of the second part agrees that the following restrictions as to the use and improvement of the property herein conveyed shall be observed herself, her heirs and assigns, to wit:

"(1) All improvements upon Lots 1 to 11, and Lots 28 to 43 inclusive, when erected shall be used for residence purposes only, and the front wall of said residences including bays but exclusive of any projecting porches, must be set on or back of the building line as shown on the plat of Wellington Place, as recorded in the Madison County Court Clerk's office. Porches extending beyond the front wall of the residence and beyond the front building line shall not be enclosed in any manner more than thirty inches above the floor of same."

Continuing, the deed set forth nine additional restrictions, those having relation to the present controversy being:

"(3) Any residence erected fronting on Lancaster Avenue shall cost not less than forty-five hundred ($4500.00) dollars. Any residence erected fronting on North Lawn, South Lawn, or Third Street, shall cost no less than thirty-five hundred ($3500.00) dollars.     *     *     *

"(9) This property shall never be sold to, rented to, leased to or occupied by persons of African descent, but this restriction shall not be construed in any event to lots numbered 41, 42, 43, 44, 45, 46 and 6 if same are reserved or retained by Belle Walker, Jennie Walker Held, and Lillian Theophanis, or any of them, so long as they retain the ownership of said lots or any of them.     *     *     *

"(10) No trade or business whatever shall be permitted or maintained upon lots fronting on Lancaster Avenue, North Lawn and South Lawn, but this is not to include doctors or dentists who may maintain an office in their residence."

The deeds from the Realty Company to appellant's two aunts conveying the remaining four lots are not in the record, but it is stipulated that they contained similar restrictions. In any event, appellant acquired title to lots 43 and 44 by deed from her aunt, Jennie Walker Held, dated August 12, 1935, containing, in addition to the restrictions quoted from the deed by which appellant acquired title to Lots 41 and 45, the following provisions annexed to restriction No. 4:

"The outbuilding on lot three (3) shall not be over 20 feet square and shall be placed in the south corner of said lot as shown on plat.

"The outbuildings on lots 28, 30, 31 and 38 shall not be over 20 feet square and shall be placed in the corner of lots adjoining lots 29 and 32 as shown on plat.

"The outbuilding on lot 43 shall not be over 20 feet square and shall be placed on the north corner of said lot as shown on plat.

"On all other lots the outbuildings shall be placed on the rear property line.

"All outbuildings erected upon the lots as hereinbefore designated shall be under one roof, and not over one story in height, and said outbuildings shall not be erected until after or along with the residence on the lot unless the owner of the lot is the owner of the residence on the adjoining lot."

How appellant acquired the complete title to Lots 42 and 46 does not appear, but it seems to be conceded by all parties that she did so by virtue of a commissioner's deed purporting to convey to her the undivided one-half interest of her aunt, Belle Walker, therein. Some of the appellees were purchasers at the auction sale, and those who were not, derived their title through conveyance from other purchasers; and it is stipulated that the deeds to all of the appellees contained the same restrictions as those contained in the deed from Jennie Walker Held to appellant. It is also stipulated that appellant and her two aunts are of African descent.

The record is poorly prepared, and we have experienced some difficulty in determining which of the restrictions, assuming them to be binding and enforceable by appellees, are applicable to the lots in controversy. It would seem clear, however, that the restrictions against use for business purposes apply to Lots 42 and 43, and that since they front upon North Lawn Drive, any residence erected thereon must cost not less than $3,500; that Lots 44, 45, and 46 are not restricted against use for business purposes, but since they front on Third Street, any residence erected thereon must cost not less than $3,500; that the outbuilding erected on Lot 43 shall not be larger than 20 feet square and must be located in the north corner; and that all five lots are subject to the restriction numbered 9, relating to their use by persons of African descent.

Appellant testified that it was the understanding between her and her aunts and the Realty Company that the lots conditionally reserved from sale would not be subject to the restrictions if not sold, and that the Company's printed deeds containing the restrictions were used in reconveying the lots to her and her aunts in order that they might have ''a reminder'' as to how the deeds had been made to the purchasers at the auction. But the written contract contains nothing to bear out the assertion and rather seems to contradict it. Moreover, it is not easily conceivable that the Company would have been willing to put itself in the position of misleading the public into the belief that all of the lots shown on the plat which it had prepared would be subject to restricted use. That it had no intention of conveying the conditionally reserved lots back to their owners without restrictions is apparent, not only from the language of the agreement, but from the fact that in all of its deeds to purchasers at the auction it incorporated restrictions relating to the reserved lots and specifically suspended the operation of the restriction against the use of the property by persons of African descent to the period during which the conditionally reserved property might be owned by appellant and her aunts.

It is insisted, however, by appellant that the restrictions were not for the benefit of the purchasers of the lots sold, but were for the sole benefit of the lots retained, citing the rule that in such cases only the grantor and the successor to his title to the retained property may en-

force the restrictions. Graham v. Hite, 93 Ky. 474, 20 S. W. 506; Feinberg v. Board of Education, etc., 210 Ky. 737, 276 S. W. 823; Holliday v. Sphar, 262 Ky. 45, 89 S. W. (2d) 327; C. J. S., vol. 26, Deeds, Section 167, pages 552, 560. But we are of the opinion that the rule relied on is wholly inapplicable to the facts of this case. It is true that had the property embraced within Lots 41 to 46, inclusive, not been conveyed to the Realty Company, nor included in the plat of the Subdivision, the purchasers of the Subdivision lots could not claim that the use of the retained property was restricted; but even in such a case, under what is known as "The Building Plan or Scheme Doctrine," they could enforce the restrictions against one another. As said by us in the case of Biltmore Development Co. v. Kohn et al., 239 Ky. 460, 39 S. W. (2d) 687, 689:

> "Where an owner of a tract of land subdivides it into building lots and sells parcels thereof to separate grantees, imposing restrictions in accordance with the general plan or scheme for uniform development, such restrictions inure to the benefit of the several grantees and may be enforced by one of the grantees against any other grantee." See also Greer et al., v. Bornstein, 246 Ky. 286, 54 S. W. (2d) 927; Anderson v. Henslee et al., 226 Ky. 465, 11 S. W. (2d) 154.

Here, although appellant insists that she and her aunts reserved the property, the owners conveyed the property to the Realty Company, first, by deed of trust, and afterward, by absolute deed, not only with power to sell it if it became necessary, but with full authority to impose building restrictions on all of the lots into which it might be subdivided, and thereafter accepted deeds from the Realty Company reconveying the lots to them with the restrictions imposed. Having made what appellant speaks of as "the reserved property" a part of the subdivision and authorized the Realty Company to impose restrictions thereon, the present owner is in no position to claim that they are not binding on her. For the reasons heretofore given, we have no doubt that the Realty Company fully intended the restrictions to apply to the lots reconveyed. At least, it had the power to impose them under the express terms of the trust deed, and appellant's approval of its action in subdividing and platting the property was recited in the absolute deed which

the three joint owners executed. Moreover, the unre-corded contract between the parties, granting that the purchasers at the auction sale had notice of its existence, contained nothing to the contrary. Appellant dwells at length on the "equities" of the case, but as we see them, they are all in favor of the appellees. Since the "re-served" property was shown as individual lots on the plat which the Realty Company made, recorded, and, doubtless, extensively advertised as the plat of a re-stricted subdivision, appellees had the right to believe that it would be included in the restrictions. That Lots 41 to 46, inclusive, were not specifically included in the advertisements of the sale, nor "flagged," nor actually sold at the auction, would not convey a contrary impres-sion, much less constitute actual notice.

The only remaining question, therefore, is whether the restriction requiring that residences erected on Lots 44, 45, and 46 should cost not less than $3,500, precludes the maintenance thereon of a "trailer camp." While "trailers" are aptly described by appellant as "little houses on wheels," they are not "erected" within the meaning of the restriction which refers, in ordinary par-lance, to a residence designed to be more or less perma-nent, and hence, attached to the soil. Appellant testified that the trailer camp which she contemplates is of a temporary nature designed to alleviate the housing shortage caused by the importation of laborers for a war project under construction in Richmond and it is a gen-erally recognized rule of law that restrictions on the use of real property are to be strictly construed and given the effect which the language in which they are expressed authorizes when considered in connection with the cir-cumstances surrounding the transaction and the objects which the parties had in view at the time of their crea-tion. Holliday v. Sphar, supra. We do not mean to say, however, that if the trailers were dismounted from their wheels, or otherwise rendered not readily movable, and allowed to· remain on the lots for a sufficient length of time to indicate that their use as vehicles had been aban-doned, this Court would hold that they were not resi-dences within the meaning of the restriction referred to.

It follows that the Chancellor correctly required ap-pellant to remove the building under construction on Lot 43, and properly refused to enjoin her from operating a trailer camp on Lots 44, 45, and 46. However, he was in

error in adjudging that Lots 44, 45, and 46 were exempt from the restrictions imposed by the Realty Company.

Judgment affirmed on the original appeal, and reversed in part on the cross-appeal.

Whole court sitting.