CHRIS THODOS, appellee, v. PAUL B. SHIRK et ux., appellants.

No. 49048.

(Reported in 79 N.W.2d 733)

DECEMBER 11, 1956.

Powers, Sloan, Woodcock & Marks and Holliday, Miller, Myers & Stewart, all of Des Moines, for appellants.

Schweiker & Schweiker, of Des Moines, for appellee.

LARSON, J.—Chris Thodos, plaintiff herein and owner of part of Lot 6, Suburban Farms, which is a part of a tract of land consisting of Lots 1 to 23 known as Suburban Farms, an Official Plat, Polk County, Iowa, and which, with the exception of Lots 8, 13, 19, 20 and 21, was formerly owned and platted in 1929 by Suburban Farms, Incorporated, brought an action in equity asking that defendants Paul B. Shirk and E. Ethel Shirk be en-

joined from using their property as a trailer court or for any commercial purpose in violation of the restrictive covenant in their deed. This restriction provided as follows:

"No building shall be placed or erected on said premises except for residence purposes, and until a residence costing at least $3000 is placed or erected on said premises, no other building shall be allowed within 150 feet of the north line of said premises."

It appears without dispute that since 1954 defendants have erected facilities and maintained a trailer court on their part of Lot 6 within one hundred and fifty feet of the north line of said lot, and the trial court on October 27, 1955, did enjoin defendants from using the North 150 feet of Lot 6, Suburban Farms, for trailer court purposes and for any commercial use whatsoever. Defendants, as owners of Lot 5 and part of Lot 6, appeal.

It is defendants' contention that the restriction in their deed is ineffective and that plaintiff is entitled to no enforceable rights thereunder; that if any rights were acquired they have been abandoned, discharged by agreement or laches, or have been terminated by the substantial change of the neighborhood and the passage of a reasonable period of time. They further contend that if any one of these circumstances alone was insufficient, when taken together they disclose a situation where equity should not enforce the restriction to the injury and damage of defendants, with no substantial benefit to plaintiff. Pertinent facts will appear in the opinion.

I. Courts of equity will enforce restrictive covenants in conveyances of real estate where the intention of the parties is clear in creating them and the restrictions are reasonable. Burgess v. Magarian, 214 Iowa 694, 243 N.W. 356; Johnson v. Robertson, 156 Iowa 64, 135 N.W. 585, Ann. Cas. 1915B 137; Stevenson v. Spivey, 132 Va. 115, 110 S.E. 367, 21 A.L.R. 1276; Foos v. Engle, 295 Ky. 114, 174 S.W.2d 5, and cases cited therein; Velie v. Richardson, 126 Minn. 334, 148 N.W. 286; Deitrick v. Leadbetter, 175 Va. 170, 8 S.E.2d 276, 127 A.L.R. 849; American Law of Property, Volume II, 1952 Ed., pages 401, 402.

The first proposition advanced by the appellants and relied upon for reversal is that the original restriction in the deed from the land company to the former owner was not shown

to be one that ran with the land, but that it appeared as a personal covenant or contract between the parties conferring no rights upon plaintiff, a subsequent owner under deed from the land company. Appellee on the other hand contends the restriction in the deed from the land company was inserted in conformity with and as a part of the execution of a general plan for the development of a certain known and well-defined property, and that it clearly appears this general scheme was intended for the benefit of all the lots in the territory originally owned by the company. Appellee says such covenants or restrictions are appurtenances which run with the land and bind the lots owned by the appellants even though by inadvertence subsequent deeds may fail to recite the restriction. Such was the case in plaintiff's deed, but he had actual notice thereof. Furthermore, constructive notice provided by the recording acts is sufficient notice.

 While there seems to be some confusion as to when such benefits or burdens run with the land, the general rule is that if by a general scheme it was the intention to mutually benefit the lots sold by the land company, and this intention actuated both the grantors and the grantees, the legal proposition that such restriction or covenant runs with the land is well settled. This proposition is not seriously challenged by the appellants. It is rather appellants' contention that appellee has not borne his burden of establishing by satisfactory and sufficient evidence that the restrictions in the original deeds were inserted therein as a part of a uniform general plan. Upon consideration of the testimony and the exhibits including plats, the trial court held that it was a uniform general plan, and under the record we agree. While Lots 8, 13, 19, 20 and 21 had no restrictions, they were never owned by the subdivider and could not be considered a part of the grantor's general plan. With these exceptions the land company owned this tract of agricultural land from the west city limits of Des Moines westward along the south side of Hickman Avenue some two thousand feet, and 650 feet deep. The lots along Hickman were numbered 1 to 17. Lot 12 became a street running north and south, with Lots 18, 19, 20, 21, 22 and 23, facing it from the west. From the record we learn

all of the lots owned by the original grantor land company were sold and contained the same or similar restrictive covenants. The only difference in restrictions was that those facing the street, Lot 12, were restrained to 135 feet of the east lot line, and the value of the residence cut to $2000. These differences were of no consequence, and it must be held that the restrictions were uniform covering all eighteen lots in the subdivision.

It further appears from the record that purchasers bought the lots for residences relying upon the restriction, and this is particularly true of Mr. Sodawasser, Mary Zazas, and Mr. Murphy, who, after a prior district court decision in 1937 involving the construction of this same restriction as to Lot 11, purchased three pieces thereof for the erection of private residences. While it is true appellee did not know of or rely upon this restriction when he purchased his lot, he complied therewith upon learning of it soon thereafter.

Appellants contend, however, that the restrictive terms used are ambiguous and vague and that the presumption relating to the free use of land overcomes any inference to the contrary, citing Peterson v. Gales, 191 Wis. 137, 210 N.W. 407, 47 A.L.R. 956; Melson v. Ormsby, 169 Iowa 522, 151 N.W. 817; 14 Am. Jur., page 621; Foos v. Engle, supra; Greer v. Bornstein, 246 Ky. 286, 54 S.W.2d 927. We find in most jurisdictions courts do not feel themselves bound by the terms of such restriction, but resort to proof of the surrounding circumstance to determine the true intent of the parties thereto when originally established. The result is most unfortunate for the bench and bar, for it has resulted in many cases on each side of the controversy, some of which are impossible to distinguish. We therefore hesitate to cite or discuss these many cases herein. Dean Pound considers such restrictions as servitudes upon the land similar at least to easements and profits, and in this view we see in general at least the benefits may be considered appurtenant to the land in the development scheme and therefore run with it. See 28 Virginia L. Rev. 1067.

If we adopt this rule, and we think it good, the establishment of such restrictions must be along the lines familiar in the establishing of other appurtenances and easements. It is fair to say the doctrine of equitable servitude has now received wide

acceptance in this country, although there is no unanimity of opinion among the cases as to whether equity is enforcing the promise as a contract or as an incorporated property interest in the burdened land. In the past we have leaned both ways. See Johnson v. Robertson and Burgess v. Magarian, both supra. We, nevertheless, prefer the theory which treats the covenant or agreement as creating an equitable property interest in the burdened land, and as an appurtenance to the benefited land. Johnson v. Robertson, supra, and cases therein cited. Also see Werner v. Graham, 181 Cal. 174, 183 P. 945; Childs v. Boston & Maine R. R., 213 Mass. 91, 99 N.E. 957, 48 L.R.A., N.S., 378; Flynn v. New York, W. & B. R. Co., 218 N.Y. 140, 112 N.E. 913, Ann. Cas. 1918B 388; Reno, The Enforcement of Equitable Servitudes in Land, 28 Virginia L. Rev. 951, 1067; 26 C.J.S., Deeds, sections 163, 164. Most equitable servitudes are created by covenants inserted by subdividers in the sale of lots in a restricted residential subdivision. These deeds, as in the case before us, are usually deeds poll, being signed only by the grantor, the subdivider.

 Courts uniformly hold that the acceptance of a deed poll by the grantee binds him as a promisor as much as if he had himself signed the deed. The acceptance of the deed amounts to an adoption of the signature of the grantor as that of the grantee also, so that the requirement of the Statute of Frauds as to signatures is considered satisfied.

 Since the doctrine of equitable servitudes rests upon the theory of a servitude imposed upon the land, enforceable against all subsequent purchasers of the land who are charged with notice actual or constructive, the requirement of the special words such as "and assigns" is unnecessary in the deed. The sole test for the running of the burden in equity is the intention of the parties to impose a servitude upon the land as distinguished from a personal promise of the present owner. Therefore, if the covenant or agreement itself creates a property interest in the nature of an equitable incorporeal interest in the burdened land appurtenant to the benefited land, then priority of estate exists by virtue of the covenant or agreement itself. As already pointed out in enforcing equitable servitudes, we have described the benefit as being a property interest appurtenant to the bene-

180

fited land, so that it can be enforced by anyone who acquires an interest in the property without regard to priority of estate with the original promisee. Johnson v. Robertson, supra; Biltmore Development Co. v. Kohn, 239 Ky. 460, 39 S.W.2d 687; annotation 21 A.L.R. 1306–1324.

Such agreements being for the most part negative in character, and since they are for the protection of property values in the community, the normal remedy sought for enforcement is an injunction in equity. Of course one seeking to enforce the equitable servitude as appurtenant to his lot has the burden of proving the intention of the original parties to the agreement. Some cases cited by appellants tend to support the view that there is a presumption against the running of the benefit upon the argument that the policy of the law is against the imposing of restrictions of unlimited duration upon land for the benefit of other land, since such restrictions tend to impair alienability. See Mathews Real Estate Co. v. National Printing & Engraving Co., 330 Mo. 190, 48 S.W.2d 911, 81 A.L.R. 1039; Stevenson v. Spivey, supra. But this argument is more than answered when we consider that the real purpose of equitable servitudes relating to building restrictions is the protection of property values in the subdivision so as to increase the desirability of these lots as residences through the existence of such restrictions. 26 C.J.S., Deeds, sections 163, 164.

From the many cases we believe the true rule is that the intention of the parties may be ascertained from the language of the instrument or may be implied from the surrounding circumstances. Burgess v. Magarian, supra; Clem v. Valentine, 155 Md. 19, 141 A. 710; Lowell Institute for Savings v. Lowell, 153 Mass. 530, 27 N.E. 518; Ridley v. Haiman, 164 Tenn. 239, 47 S.W.2d 750.

Determination may be aided where the agreement appears to be a part of a general building plan for a subdivision, and where the agreement in question is entered into pursuant to a general building plan for the subdivision, the courts uniformly hold that evidence of the existence of such a plan at the time the agreement is made will be sufficient evidence of an intention to attach the benefit to the remaining lots of the sub-

divider. This rule does not apply, of course, as to restrictions shown in deeds to lots sold prior to any plan, for such evidence of restrictions alone would fail to show the restrictions were inserted with the intention to create a uniformly restricted subdivision at the time of the agreement. However as here, where the evidence tends to show uniform restrictions inserted in the sales of other lots, both before and after the date of the restricted deed in question, such evidence is sufficient to show the existence of an intention in the parties that the benefit shall attach to all other lots of the promisee. In order to prove the existence of a general plan by evidence of similar restrictions imposed in the sale of other lots in the subdivision, it is not necessary that the identical restrictions be found in every deed, so long as the scheme of creating a uniform subdivision is still apparent. Leader v. LaFlamme, 111 Maine 242, 88 A. 859; Frink v. Hughes, 133 Mich. 63, 94 N.W. 601; Morrow v. Hasselman, 69 N. J. Eq. 612, 61 A. 369; Ridgway v. Cockburn, 163 Misc. 511, 296 N. Y. S. 936. It is only where the variation or absence of restrictions destroys the uniform character of the subdivision that we find it impossible to infer the creation of a benefit appurtenant, and must then find the benefit personal to the subdivider.

From these facts and circumstances and the plain wording of the restriction, we are satisfied there was a uniform general plan to establish small acreages to be used for residences and for agricultural purposes. Such was the import of the evidence and the fair inferences thereto connected. As a general rule, if the required performance touches and concerns the land, and tends necessarily to enhance its value or render it more beneficial to the owner for the use contemplated, it is a covenant running with the land. 14 Am. Jur., page 497, section 20.

The basis of the modern rule rests upon the equitable doctrine of notice—that he who takes land with notice, actual or constructive, of a restriction upon it will not in equity and good conscience be permitted to act in violation of the terms of the restriction. This is known as the doctrine of Tulk v. Moxhay, 2 Phil. 774, 41 Eng. Rep. 1143. See Clark, Covenants and Interests Running with Land, Second Ed., chapter VI, page 170.

Perhaps we have discussed the foregoing proposition further than necessary, but feel the nature of this appurtenance

and its existence must be fully understood, for if it is determined to be in the nature of an easement, it must pass with the land until extinguished under the usual rules for extinguishment of legal easements. Such covenants running with the land are subject to discharge at law by (1) merger of the lands benefited and burdened; (2) duly executed release; and (3) a new covenant operating as a release or modification of the original. These manners of discharge are also recognized in equity, but in addition thereto we find additional types of discharge, i.e., abandonment, and the personal defenses of acquiescence, laches and estoppel, and another in the nature of a bar, referred to as such a change in the character of the neighborhood as to defeat the purpose of the original restriction and make equity interference to enforce such restriction both unjust and futile. See 5 Restatement of Property (1944), section 558; 16 Michigan L. Rev. 90 to 105; 31 Harvard L. Rev. 876; 3 Tiffany on Real Property (Third Ed. 1939), section 875, page 522.

Having determined that there was sufficient evidence of a uniform general plan or scheme, together with the clear intention disclosed by the words used to support the finding that the equitable servitude was an appurtenance running with the land, we must next consider appellants' further contention that it was discharged or its effectiveness so nullified that equity will not grant the relief prayed.

II. It is true that relief in a court of equity is a matter of grace and not of right, but some rather well-defined guides have been set forth by the courts to suggest when and under what conditions these actions will not be entertained.

We shall first consider the contention that there was an abandonment by the dominant owners herein. Abandonment depends upon the existence of conduct by the owners of the benefited land showing an intent to relinquish the benefit of the servitude. American Law of Property, Volume II, page 439; 5 Restatement of Property (1944), sections 555 and 558, comment b. Such things as failure of the subdivider to carry out the general plan, and where after it was carried out by general agreement or consent the subsequent owners of the restricted lots have substantially violated the restrictions with community acquiescence, are in point. However, in order for community

violation to constitute an abandonment, it must be so general as to frustrate the object of the scheme so that the enforcement of the restriction involved would seriously impair the value of the burdened lot without conferring any substantial benefit on the adjoining lots. Thus, sporadic and distant violations do not in themselves furnish adequate evidence of abandonment. Thompson v. Langan, 172 Mo. App. 64, 154 S.W. 808; Ward v. Prospect Manor Corp., 188 Wis. 534, 206 N.W. 856, 46 A.L.R. 364. But they may be considered in connection with outside changes. Hurd v. Albert, 214 Cal. 15, 3 P.2d 545, 76 A.L.R. 1348. Violations as to types of buildings, as distinguished from use violations, will be given more or greater weight as evidence of abandonment since the former violations create permanent changes which are not easily corrected by the violator. Much of the evidence herein relates to minor and temporary use violations. We find no previous serious violation of the building restriction except in the instance pertaining to a gas station on Lot 11, which was by injunction in 1937 ordered removed as a breach of the identical covenant and restriction used in other deeds of this subdivision. Other violations, if they were violations, were minor uses such as raising rabbits and dogs for sale or selling home-made outdoor furniture, renting rooms, etc. on several of the near-by lots, and were clearly of a trivial, temporary and immaterial nature. They could not be called substantial or general violations commonly known and acquiesced in, such as to amount to the consent of property owners in the subdivision to abandon the restrictions against a commercial business, or to defeat the primary residential purpose of the servitude. It is not clear whether or not the owner of Lots 7 and 8, 8 being unrestricted, did violate the restrictive covenants as to Lot 7 by maintaining thereon a tourist court, but if he alone did so on the rear of Lot 7, it would not constitute conclusive evidence of group abandonment of these restrictions.

Appellants contend that the agreement, Exhibit 9, amounted to a general release or abandonment of all restrictions by everyone concerned. The terms of this agreement disclose an apparent intent to abandon the restriction on all lots. However, the facts do not substantiate such a sweeping intention, for Mr.

Blattenburg, appellants' grantor, by a deed containing this restriction, testified he circulated Exhibit 9, the "Agreement to Terminate Building Restrictions" in an effort to free his Lots 5 and 6 in order that a supermarket beneficial to all local property could be erected thereon. It provided:

"* * * IT IS MUTUALLY AGREED by and between the undersigned owners of the lots in 'Suburban Farms', an Official Plat, in Polk County, Iowa, for and in consideration of their mutual benefits, One Dollar and other valuable considerations, to, and they do hereby release Lots (1) to (23), inclusive, of 'Suburban Farms', an Official Plat in Polk County, Iowa, from the following restriction: [restriction set forth] and we, and each of us, do hereby abrogate, terminate, cancel, and annul said restriction in so far as the same applies to the said Lots (1) to (23) inclusive, * * *."

Blattenburg testified he informed all parties of the extent of his purpose and plan and asked for their signatures. Although all the owners in this subdivision except those of Lot 9 signed, including plaintiff, the proposed plan fell through and was dropped. Blattenburg said "the deal was not completed." The instrument was not recorded. It did not become effective. Its purpose was never carried out and was not binding on those who signed with the condition or understanding that all would sign and that the supermarket would be built. Under these conditions such proposed release of restrictions cannot be taken as conclusive evidence of an abandonment or of an unconditional intention to abandon all such restrictions. In fact, we find other subsequent petitions to the Polk County Board of Supervisors signed by many of these lot owners to have this tract zoned residential. If there were any importance to be given Exhibit 9 as evidence of an intent to abandon, it is countered by later petitions evidencing the opposite community desire.

III. We must next consider the personal defenses of acquiescence, laches and estoppel. The equitable defense of acquiescence arises where the complainant has acquiesced in a violation of the same type of restriction by third parties. Here defendants contend the complainant has failed to enforce a similar equitable servitude against third parties (i.e., owners of Lot 7) and has debarred himself from obtaining equitable relief

against the defendants for subsequent violations of the same character. Johnson v. Robertson, supra; Rogers v. Zwolak, 12 Del. Ch. 200, 110 A. 674. The basis of these defendants' claim is that failure to act against the man on their left, who operated a tourist court on the rear of Lot 7, induced defendants to assume the restrictions were no longer in effect. This defense may have had merit in regard to appellee's right to restrain appellants' use of the rear of Lot 5 as a trailer court first commenced in 1951, but has no application to the building line restriction and the construction in 1954. The injunction issued does not affect the use of the property back of the 150-foot building line, and appellee raised no objection thereto. The main difficulty in this contention is that when defendants first commenced their work to place trailer platforms on the front 150 feet of their property, plaintiff told them they could not do so because of the restriction. Thus defendants were not misled as to the considered effectiveness of that restriction.

 The same reasoning also tends to dispose of the contention that plaintiff was guilty of laches. What constitutes reasonable promptness in bringing suit is a question of fact depending on the circumstances of each case. Bausman v. Kelley, 38 Minn. 197, 36 N.W. 333, 8 Am. St. Rep. 661; Cantieny v. Boze, 209 Minn. 407, 296 N.W. 491, 173 A.L.R. 321; Mackall v. Casilear, 137 U. S. 556, 566, 11 S. Ct. 178, 34 L. Ed. 776; Stewart v. Finkelstone, 206 Mass. 28, 92 N.E. 37, 28 L.R.A., N.S., 634, 138 Am. St. Rep. 370. Many cases cited on both sides of this question prove only that a clear and pronounced delay in bringing suit after knowledge of the breach, which period has justified the defendants in believing the plaintiff acquiesced, will be accepted as the basis of a refusal by equity to grant relief for the violation of such a restrictive covenant. The basis of the doctrine of "laches" is that public policy requires, for the peace of security, the discouragement of stale demands. Cantieny v. Boze, supra, cited by appellants on this point, which goes quite far in establishing laches, is not in point here. We find no evidence of an unreasonable delay in asserting a known right resulting in prejudice to defendants. The north 150 feet of Lot 6 owned by defendants was vacant until the fall of 1954, at which time defendants began the construction of trailer platforms thereon.

After they were completed with water, electricity and sewer for trailers, these plots rented for $25 per month. When work was commenced, plaintiff talked to defendants and testified to the following conversation:

"'You know what the rules are here. Have you read the deed and abstract?' He says, 'Yes'. I say, 'Your abstract says no, you can't put it over here, but 150 feet back.' He says, 'I am going to put them on and nobody can stop me.'"

An attorney was promptly consulted and wrote defendants a further warning. The petition in this case was filed November 22, 1954. Clearly this is an insufficient showing of laches. There was practically no delay in seeking relief in court. Nor do these facts establish grounds for estoppel. Defendants did not rely on any plaintiff act or statement encouraging the violation of this building line and use restriction.

IV. We come now to the question as to whether or not the neighborhood has so changed since the establishment of this restricted tract that it is no longer possible for those lots to receive the benefit intended by the covenants, and that due to acts of third persons the building scheme for the subdivision has been frustrated through no fault of the lot owners themselves.

Courts of equity recognize conditions usually resulting from growth and expansion of a city, which may by business and industry unrestricted so surround and isolate a restricted tract that its anticipated use and benefits are impossible to secure or maintain. Where changes of conditions result through violations within the subdivision, it is a problem of abandonment, and where changes of conditions on the outside occur, it becomes a problem of whether or not these conditions affect the entire subdivision in a way that its restrictive purposes would be defeated. In both cases the factual situation largely governs as to whether or not equity will refuse to enforce the restrictions for the reason that by so doing the result would be oppressive and inequitable without any appreciable value to other property in the restricted area. It has been said that in order for this equitable defense of change of conditions to arise, there must be a change in the character of the surrounding neighborhood sufficient to make it im-

possible any longer to secure in a substantial degree the benefits sought to be realized through the performance of the building restriction. Jackson v. Stevenson, 156 Mass. 496, 31 N.E. 691, 32 Am. St. Rep. 476; Windemere-Grand Improvement & Protective Assn. v. American State Bank of Highland Park, 205 Mich. 539, 172 N.W. 29; Mathews Real Estate Co. v. National Printing & Engraving Co., 330 Mo. 190, 48 S.W.2d 911, 81 A.L.R. 1039; Trustees of Columbia College v. Thacher, 87 N. Y. 311; Strong v. Hancock, 201 Cal. 530, 258 P. 60. There is also respectable authority which holds that the change must be such as to render the restriction valueless to the owner of the benefited land and oppressive or unreasonable as to the owner of the burdened land. Hurd v. Albert, supra; Dolan v. Brown, 338 Ill. 412, 170 N.E. 425; Lattimer v. Livermore, 72 N. Y. 174; Hunter v. Wood, 277 Pa. 150, 120 A. 781. This then is clearly an equitable defense and it is defendants' burden to show that the conditions are such that equity in good conscience would not compel compliance with the restrictive covenants.

From the record we find that since the tract involved was subdivided in 1929, Hickman Road has changed from a county poorly-improved, little-used shale road to a busy paved primary highway carrying many times as much traffic; that on the very sparsely-populated tract of agricultural land across the road, seven or eight places of business have been established; that there are no known restrictions on that property, and only about three dwellings are interspersed between those businesses. In the two-block area these businesses consist of tourist courts, restaurants, a beauty parlor, and a gas station. It is pointed out that more traffic and additional businesses have sprung up across the street since 1937 when the district court reviewed the situation in the Clos case, Exhibit 2, and subsequent to the ownership of plaintiff and defendants in their property. It may be true that this adjacent development of a rather substantial business district with little or no restrictions may tend to reduce Suburban Farms properties' desirability as residential, but we think the showing falls far short of disclosing a surrounding isolation or residential destruction of Suburban Farms by business and commercial property such as we find in the California case of Hurd v. Albert, supra, principally relied upon by de-

fendants. To the west and northwest the record discloses large new restricted residential subdivisions with far stricter requirements for building fine residences. On the east we find no change, it being zoned under the zoning laws of the City of Des Moines. To the south are other residential lots. Should the restrictions be upheld and enforced, all property owners along Hickman Road in Suburban Farms, with the exception of those of Lot 8, will be required to observe the restriction as to distance from the north line of the lot, and this tract will remain residential and agricultural in nature. It cannot in fairness be said that the establishment of these few commercial businesses across the street, plus greatly increased vehicular traffic on U. S. Highway 6, so change the neighborhood as to make it impossible any longer to secure in a substantial degree the benefits sought by the restrictive covenants upon this tract of land or upon defendants' lots. Obviously, if we held the restrictions were discharged on defendants' property on this ground, it should apply to all twenty-three lots in Suburban Farms, and this would not be justified by this record. As to this general application, we realize there is a division of authority. See American Law of Property, Volume II, page 446. Its determination is not required at this time and so we do not decide that point here.

We have carefully studied the various arguments made as to each ground defendants believe should justify a refusal of the court of equity to act, and find none sufficient to deny plaintiff relief. We also are unable to add them together with any different result. The trial court, after observing the properties, found from all the facts and circumstances the proprietors of this tract of land intended Suburban Farms as platted be under a general plan or scheme restricted to residential rather than commercial use, and there was established an equitable servitude on each lot for the benefit of all other lots. It found there was no abandonment of these restrictions by those concerned, no laches, acquiescence or estoppel, and that while the neighborhood was changed somewhat, it was not of sufficient amount or character as to vitally affect the anticipated use to be made of the Suburban Farms tract, and therefore equity would act to restrain a clear violation of the restriction in defendants' use of their property.

It held further that as a matter of law the operation of this trailer court on the front 150 feet of Lot 6 by defendants was a commercial enterprise. See Foos v. Engle, supra. We agree with all these determinations. It appearing that there was no residence costing at least $3000 on defendants' part of Lot 6, under the restriction no other building could be permitted within 150 feet of the north line of the premises, and the trial court's judgment and decree must be affirmed.—Affirmed.

All JUSTICES concur.