UNITED PROPERTIES, INC., First Central Service Corporation, and The Albright Development Corporation, Plaintiffs-Appellees,

v.

Donald WALSMITH, Jr., and Beverly Walsmith, Defendants-Appellants,

Donald Cunningham, et al., Intervenors-Appellees.

No. 2–64868.

Court of Appeals of Iowa.

Aug. 25, 1981.

Roger J. Kuhle of Myers, Knox & Hart, Des Moines, for defendants-appellants.

Charles Coppola of Coppola, Coppola & Clark, Des Moines, for plaintiffs-appellees.

Dale Spencer, Des Moines, for intervenors-appellees.

Heard by OXBERGER, C. J., and DONIELSON, SNELL, CARTER and JOHNSON, JJ.

JOHNSON, Judge.

Defendants appeal from trial court's judgment granting a mandatory injunction against them which required them to remove a fence on their property and to restore the premises to the condition existing prior to erection of the fence. Defendants assert 1) that the balance of equities in this case made it improper for trial court to issue a mandatory injunction, 2) that trial court erred in ruling defendants had not pled estoppel as an affirmative defense and in finding no apparent authority vested in the alleged agent upon whom the defend-

ants argue they relied, 3) that trial court erred in sustaining plaintiffs' objections to interrogatories propounded by defendants, and 4) that trial court erred in admitting hearsay evidence over defendants' objections. We affirm.

Northland Mortgage Company and Albright Development Company (two Iowa corporations) entered into a joint venture to develop land known as Echo Valley Estates. Northland was the financial partner and Albright developed the lots. On December 28, 1973, Northland and another corporation, United Properties, Inc. (UPI), executed and recorded an instrument entitled "Declarations of Residential Covenants." This instrument named Northland and UPI as the owners of Echo Valley Estates and contained certain declarations including the restrictive covenants which are at issue in this case. The pertinent parts of the declaration provide:

WHEREAS, Declarants are the owners of certain real property known as ECHO VALLEY ESTATES, located in the County of Warren, in the State of Iowa, part of which is more particularly described as: Lots 1 through 77, inclusive, except Lot 42, ECHO VALLEY ESTATES, platted of record in Warren County, Iowa.

WHEREAS, Declarants are desirous of protecting the value and desirability of the whole of ECHO VALLEY ESTATES including the real property described above.

NOW, THEREFORE, Declarants hereby declare that all of the properties described above, namely consecutive numbered Lots 1 through 77, inclusive, except Lot 42, shall be held, sold and conveyed subject to the following restrictions, covenants, and conditions, which are for the purpose of protecting the value and desirability of, and which shall run with, the real property and be binding on all parties having any right, title or interest in the described properties or any part thereof, their heirs, successors and assigns, and shall inure to the benefit of each owner thereof . . .

14. ARCHITECTURAL CONTROL. No building or structure, nor any addition or alteration thereof, shall be constructed, altered, or maintained on any portion of any building plot unless and until detailed plans, specifications, proposals, and site plans (hereinafter collectively referred to as "plans") shall have been filed in writing with and have been approved in writing by Northland Mortgage Company. These submitted plans shall contain details of design, color scheme, elevation, side grade, fencing and location and dimensions of structures, walks, and driveways, and shall also state the type construction and materials to be used in construction.

\* \* \* \* \* \*

Failure of Northland Mortgage Company to disapprove plans within thirty (30) days after submission of said plans shall be deemed to be approval thereof.

\* \* \* \* \* \*

Northland Mortgage Company shall transfer its approval authority under paragraph 14 to United Properties, Inc., when all of the lots are sold and a dwelling completed on each building plot.

20. FENCES. No fences, walls, or enclosures of any type or nature whatsoever shall be constructed, erected or placed upon any of the lots restricted, hereby without the written consent of Northland Mortgage Company pursuant to Paragraph 14 hereof. No fences, walls or enclosures may be erected on any side or rear lot line which abutts the golf course.

On September 5, 1975, Northland executed and recorded an assignment of architectural control to First Central Service Corporation. Apparently, in addition to the assignment of architectural control, Northland conveyed all the lots in Echo Valley Estates to First Central. Subsequently, on July 7, 1978, First Central, having conveyed each and every lot in Echo Valley Estates to Albright, assigned all architectural control to Albright. Neither the dates of conveyance of the land nor the dates of recordation of the deeds are revealed in the record. It appears, however, that those

events transpired prior to defendants' purchase of Lot 2 in November, 1977, since the recitation the July 7, 1978 assignment states that "*all*" the lots had been conveyed to Albright. (emphasis added).

Subsequent to moving into the home on December 1, 1977, defendants decided to build a fence on their property and, in the spring of 1978, contacted neighbors to ask whether they had any objections to defendants' plan. Defendants learned for the first time, from those neighbors, that there were building restrictions in existence, and that approval was required to construct fences. They contacted Mr. and Mrs. Dave Albright, who lived in the development, because Dave was the sole shareholder of Albright Development Corporation. They made inquiries regarding the architectural control and were told that since the development was almost complete, Mr. Albright had no authority. The Albrights referred the defendants to Echo Valley Country Club to see Ms. Reggie Cunningham, a club employee.

The Club was owned by UPI and Ms. Cunningham worked directly for UPI's president, Ed Coppola. She advised him on day-to-day club functions and received other communications on behalf of UPI, thereafter forwarding them to Mr. Coppola. Ms. Cunningham told Mrs. Walsmith that she believed Mr. Coppola did not allow any fences on the property; but after Mrs. Walsmith informed Ms. Cunningham that she had been told by neighbors that an architectural control committee had the power to approve or disapprove fences, Ms. Cunningham said she would check with Mr. Coppola and send a copy of the covenants to defendants. After some delay, Mr. Walsmith picked up a copy of the covenants in person.

On April 6, 1978, Mrs. Walsmith wrote to Northland, informing the corporation of her intent to erect a fence around her backyard.[1] On April 14, 1978, she contracted for

the fencing job with Montgomery Ward & Co. Having heard nothing from Northland within thirty days after submission of her application to fence, she assumed she had approval, as provided in the covenants, and thereafter started construction.

On the morning the fence crew commenced work, Mrs. Walsmith received a phone call from Mrs. David Albright asking if she was aware she could not build the fence. Reggie Cunningham visited Mrs. Walsmith in person and told her she represented Mr. Coppola and that Mrs. Walsmith was to cease and desist building the fence. Don Cunningham, a resident who also had built eight houses in Echo Valley, visited Mrs. Walsmith and told her the regulation prohibited her from building the fence. Believing she had complied with the covenants, Mrs. Walsmith allowed the work crew to complete construction of the fence.

UPI, First Central, and Albright Corporations thereafter filed this action seeking a mandatory injunction for removal of the fence and restoration of the premises to the original condition. Ninety-three lot owners in Echo Valley Estates subsequently joined as intervenors. Trial court rendered judgment in favor of the plaintiffs and issued the injunction. This appeal followed.

**I. Scope of Review.** Since this is an action in equity, our review is de novo. Although this scope contemplates review of the entire case, such review is confined to those propositions relied on by each party for reversal or affirmance; errors or propositions not assigned will not be considered on appeal. *Rector v. Alcorn*, 241 N.W.2d 196, 200 (Iowa 1976).

**II. Nature of Restrictive Covenants.** Before determining whether trial court properly issued the injunction, we must first discuss the nature of restrictive covenants. The law reflects a two-fold nature. Such covenants are promises respecting the use of the land which, on the one

---

1. The letter stated:

In accordance with the covenants of Echo Valley Estates, Warren County, Iowa, Paragraph # 14, this letter is to notify you of our plans to fence.

We are going to fence the back 110' of our yard—Lot # 2—which is not a restricted lot—it directly adjoins a cornfield on the rear lot line. We are going to use 48" chain link fencing. (Exhibit A)

hand, create proprietary interests[2] and, on the other hand, create contractual rights. *Compiano v. Kuntz*, 226 N.W.2d 245, 248 (Iowa 1975); *Thodos v. Shirk*, 248 Iowa 172, 179, 79 N.W.2d 733, 737 (Iowa 1956). Historically, there has been no unanimity of opinion among the jurisdictions as to whether equity is enforcing the promise as a contract or as an incorporated property interest. *Id.* While our earlier cases have gone both ways (*id.; see also Burgess v. Magarian*, 214 Iowa 694, 243 N.W. 356 (1932); *Johnson v. Robertson*, 156 Iowa 64, 135 N.W. 585 (1912)), the court, in *Thodos*, finally expressed its preference for the theory which treats such covenants as creating equitable property interests in the burdened lands as an appurtenance to the benefited lands. 248 Iowa at 179, 79 N.W.2d at 737. However, the contractual nature of the rights created cannot be ignored. In fact, the supreme court, when finding the contractual nature of restrictive covenants dispositive of an issue before it, has confined its discussion to the contractual ramifications of an instrument in question and has refused to ponder the proprietary nature of the covenants. *Compiano*, 226 N.W.2d at 249. We believe that the instant case can be resolved by examining the contractual nature of the restrictive covenants at issue.

**III. Creation of Rights.** Promises respecting the use of land can be made in a variety of ways: a) by a single restricting instrument in which all lot owners join; b) by a landowner's series of deeds containing restrictions on lots in a tract; or c) by a landowner's restricting instrument on lots in a tract followed by deeds to these lots. *Compiano*, 226 N.W.2d at 248. Regardless of the form of the restriction, the result is the same—the lot owners promise each other to use their lots in conformity with the restrictions. *Id.* The time at which the promises arise, however, varies with the form in which the promises are made. *Id.*

When a restricting instrument on several lots is made by the original owner, followed by deeds to the lots, the promises do not arise until the first deed to an individual lot is given. *Id.* Until that time, the owner of the entire tract may withdraw the restrictions. *Id.; Compiano v. Jones*, 269 N.W.2d 459, 460 (Iowa 1978); 20 Am.Jur.2d *Covenants, Conditions & Restrictions* § 179 at 742 (1965); 26 C.J.S. *Deeds* § 167(2) at 1145 (1956). If the restrictions can be withdrawn, they can, of course, be modified.

In the instant case, Northland and UPI executed and recorded a unilateral instrument which, *inter alia*, established certain building restrictions upon the whole tract of land owned by the two corporations. The entire tract was subsequently conveyed to First Central, then to Albright, and finally to individual lot purchasers. Thus, the promises in the instant case were created in accordance with method (c). We believe, however, for the reasons which follow, that the mutual promises were not created, nor did the covenants become irrevocable, until sometime after Northland transferred architectural control to First Central.

The record indicates that no individual lots had been purchased by the time Northland assigned architectural control to First Central on September 5, 1975. The record also establishes that Northland and UPI conveyed the entire tract to First Central, although the exact date of the transfer is not shown.[3] We believe, however, that determination of the exact time of this conveyance is not crucial to our analysis. Since there had been no conveyances of individual lots as of September 5, 1975, there existed no reciprocal burdened and benefited estates and, therefore, no reciprocal promises by landowners to act in accordance with any use restrictions or covenants. At that point there existed a mere unilateral instrument, revocable at will. We thus conclude

2. The declaration, quoted in part above, stated that the covenants were to run with the real property.

3. According to the original declaration, Northland and UPI were the owners of the tract of land. The document filed July 7, 1978, purporting to assign architectural control from First Central to Albright, states that First Central had conveyed "each and every lot" to Albright. We thus conclude that Northland and UPI previously conveyed the tract to First Central.

that the instrument assigning architectural control to First Central was a modification of the original declaration which, nonetheless, effectively transferred such control from Northland to First Central.

We also conclude once these instruments were recorded that, to effect a valid revocation or modification, it was encumbant upon First Central, or any other owner of the entire tract, to revoke or modify the instruments prior to conveyance ·of any individual lot. To hold otherwise would work a substantial injustice to ·subsequent lot purchasers and would violate the purpose of our recording act. Since the individual lot purchasers would have purchased their lots with notice of the use restrictions, sections 558.11 and 558.41, the Code, according to the aforementioned rules governing creation of equitable servitudes, they would be entitled to consider their lands benefited by the use restrictions. To hold that recorded instruments were ineffective as to these subsequent purchasers would pervert the concept of notice because a solemn recital must be accepted as true and one upon which a subsequent purchaser may with safety rely. *Keefe v. Cropper*, 196 Iowa 1179, 194 N.W. 305 (1923).

Applying these rules to the instant case, we conclude that the recordation of these instruments placed defendants on constructive notice that architectural control was transferred from Northland to First Central. Defendants thus sent their request to build the fence to the wrong party. Consequently, it was of no effect and the terms of the declaration providing for automatic approval after thirty days from dispatch of a written request to build were inapplicable.

Although it is not crucial to our analysis, we also conclude plaintiffs' assertion that the assignment from First Central to Albright placed the defendants on notice of that assignment, and thereby subjected them to its provisions, is unsupportable.

We believe the assignment had no effect with regard to these defendants. First there was no actual or constructive notice to the defendants of the assignment.[4] Since the recording act places subsequent purchasers on constructive notice of the contents of the instrument recorded, the defendants, who were *prior* purchasers, were not put on notice. *See* § 558.41, The Code. There also is no evidence in the record that defendants were actually notified of the assignment, or that they were otherwise placed on constructive or inquiry notice. Having no notice of the assignment, they were not subject to its provisions. § 558.41, The Code; *Broyles v. Iowa Dept. of Social Services*, 305 N.W.2d at 718, 723 (Iowa 1981); 6 Am.Jur.2d *Assignments* § 96 (1963). *See also Thodos*, 79 N.W.2d at 737 (equitable servitudes are enforceable only against subsequent purchasers of the land who are changed with actual or constructive notice). Secondly, the assignment from First Central to Albright took place after notice of intent to build was dispatched by defendants, and after construction had been completed. We thus believe that assignment is irrelevant to the resolution of this case.

**IV. Estoppel.** Defendants argue that the plaintiffs should be estopped from asserting noncompliance with the covenants because an alleged agent of UPI led them to believe the request to build was to be sent to Northland. They further argue trial court erred in holding that they had not pled estoppel.

While we believe trial court properly concluded that defendants failed to plead estoppel, we also conclude trial court properly found defendants failed in their proof. Even assuming, without deciding, that Reggie Cunningham was an agent of UPI with apparent authority to act on its behalf, we are unpersuaded by defendants' argument that her mere act of furnishing a copy of the original covenants is sufficient to establish estoppel.

---

4. This instrument, of course, was a valid "assignment" because it transferred contractual rights, created out of the unilateral instrument upon sale of the individual lots to a third party. *See Broyles v. Iowa Dept. of Social Services*, 305 N.W.2d 718, 721 (Iowa 1981).

The defense of estoppel requires defendants to prove, by clear and convincing evidence: 1) a false representation or concealment of material facts; 2) a lack of knowledge of the true facts on the part of person claiming the defense; 3) intention by person making the reprsentation or effecting the concealment that it be acted upon; and, 4) reliance upon the representation or concealment, by the party to whom made, to his or her prejudice and injury. *Johnson v. Johnson*, 301 N.W.2d 750, 754 (Iowa 1981). From our review of the record, we find defendants failed to prove 1) their own lack of knowledge, 2) intent of the person making the representation, and 3) reliance. In light of their constructive notice, actual warnings by several persons, and the general appearance of the entire development, defendants have failed to establish their "lack of knowledge or of means of knowledge of the real facts." *Dierking v. Bellas Hess Superstore*, 258 N.W.2d 312, 316 (Iowa 1977). Further, the evidence is inadequate to show Ms. Cunningham knowingly gave defendants a copy of the original covenants with the intent that they rely on its provisions. *Id.* Finally, in light of all the facts, defendants have failed to show their reliance was reasonable. *Id.*

**V. Objection to Interrogatories.** Defendants assert that trial court erred in sustaining plaintiffs' objections to their interrogatories propounded to intervenors. Trial court sustained the objections on the grounds that the "administration of justice would not be served by requiring the intervenors to answer the interrogatories, and that no useful purpose would be served by requiring the interrogatories to be answered." Defendants argue that, although certain questions propounded may appear on their face to be frivolous, they were necessary for preparation of certain affirmative and equitable defenses. We are not persuaded by defendants' argument.

Trial court has wide discretion in ruling upon the discoverable nature of requested information and will not be reversed unless an abuse of discretion is found. *Pollock v. Deere and Co.*, 282 N.W.2d 735, 738 (Iowa 1979). Guidelines for testing claims of abuse of discretion were outlined in *State v. Noonan*, 246 N.W.2d 236, 237 (Iowa 1976), wherein the court stated:

The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an "abuse" in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias. . . . [citing authority].

*Id.* at 237 (quoting *Wendel v. Swanberg*, 384 Mich. 468, [475–76], 185 N.W.2d 348, 351 (1971)), (as quoted in *State v. Warner*, 229 N.W.2d 776, 783 (Iowa 1975)).

We do not believe trial court's judgment in this matter can be characterized as violative of fact and logic, a perversity of will, a defiance of judgment, or the exercise of passion or bias. Defendants admit that, on their face, certain interrogatories appear frivolous. Trial court, basing its decision on the pleadings, determined that the issues raised by the petition and answer were not complex, and that requiring 93 individuals to answer the same interrogatories could not serve a useful purpose. Under these circumstances, we find no abuse of discretion.

**VI. Admissibility of Hearsay Evidence.** Defendants also contend that trial court erred in admitting into evidence a letter to UPI, purportedly signed by numerous Echo Valley residents, expressing the residents' concern over the erection of the defendants' fence and asking that steps be taken to enforce the restrictive covenants. Defendants argue that such evidence is hearsay and inadmissible. We find no error.

First, we note that trial court accepted the letter into evidence subject to defendants' objection. This was in accordance with the usual equity practice in Iowa. The rule of evidence in equity cases is that

the trial judge, while noting objections, may not exclude offered evidence. *O'Dell v. O'Dell*, 238 Iowa 434, 465, 26 N.W.2d 401, 417 (Iowa 1947); *Keith v. Community School District*, 262 N.W.2d 249, 255 (Iowa 1978). Furthermore, since the evidence was taken subject to the objection, there is no ruling for us to review. *O'Dell*, 26 N.W.2d at 417, citing *In Baadte v. Walgenbach*, 185 Iowa 773, 780–81, 171 N.W. 146, 148 (1919). The purpose of this practice is to preserve a complete record for the trial and appellate courts, leaving to them the rejection of inadmissible evidence when deciding an issue, *O'Dell*, 26 N.W.2d at 417; and, upon the appellate court's review de novo, it thus may decide the case without remand. *Id.*

■ In the instant case, under our de novo review, we arrive at the same result on the merits as the trial court with or without that evidence. We thus find no reversible error.

**VII. Appropriate Remedy.** This brings us to the difficult question of what relief is proper. Plaintiffs asked for and trial court granted a mandatory injunction ordering removal of the fence. Defendants argue that such a remedy is inconsistent with the equities of this case.

■ The fact that defendants have violated the covenant restricting the use of their land does not automatically entitle plaintiffs to an injunction. *Johnson v. Pattison*, 185 N.W.2d 790, 797 (Iowa 1971). The appropriateness of an injunction depends upon a comparative appraisal of certain relevant factors. The court succinctly analyzed the relevant factors in the *Johnson* case stating:

> Equity usually invokes its extraordinary injunctive power only when necessary to prevent irreparable harm or when the complaining party is otherwise without an effective remedy. If the injury is slight and an injunction would result in serious hardship or loss to defendant, courts have refused to enjoin, leaving the plaintiff to his claim for damages. Under this comparative injury doctrine, injunctions which are likely to cause greater injustice than they seek to prevent are properly refused.

However, there are definite limitations to this rule. As said in 42 Am.Jur.2d, Injunctions, Section 60, page 804, "Certainly, the doctrine [of comparative injury or relative convenience] does not mean that substantial, certain, and irreparable damages ... which might be prevented by injunction are to be left without remedy because of the fact that greater damages would result to the defendant, a wrongdoer, by issuing the injunction." See also 43 C.J.S., Injunctions, Section 87, page 587.

This court held in *Johnson v. Robertson*, 156 Iowa 64, 81, 82, 135 N.W. 585, 592, that enforcement of building restrictions may be denied where the defendant would thereby be subject to great hardship, but mere pecuniary loss to defendant is no basis for refusing an injunction. Each case must rest on its own peculiar facts....

*Id.* at 797–98.

■ In this case, we believe the equities are with the plaintiffs. While it is true that an injunction requiring removal of the fence and restoration of the premises will cause the defendants some pecuniary damage, the restrictive covenants were created for protection of the value and desirability of the property of the many individual lot owners in Echo Valley Estates. Their interest is real and substantial, and deserving of protection. Whatever hardship there is, it must rest on defendants. They knew of the residential scheme and restrictions created for the benefit of the community; they knew that there was opposition to construction of the fence. In fact, they were confronted with hostile manifestations of this opposition on the day construction began. They were emphatically told to "cease and desist" by a representative of the entity they believed had consented to the construction. Nonetheless, they proceeded to build their fence. Moreover, it was the defendants' own error which resulted in their request being ineffective. The law provided a method by which all land owners can apprise themselves of instru-

ments affecting their real estate. Defendants made no attempt to use this method and should not be relieved of its consequences. Neither should the consequences of the defendants' own failure, in all fairness and justice, be visited upon the plaintiffs.

We believe the only effective remedy is injunctive. Although the damage to plaintiffs is real and substantial, it is incapable of valuation. Money cannot cure the damage to the desirability of the community in which the plaintiffs and intervenors live.

We find no merit to defendants' claim that their substantial compliance with the covenants precludes equity's enforcement of the restrictions. As we indicated above, we believe the actions by the defendants amounted to noncompliance with the covenants, not substantial compliance.

We also consider defendants' argument that since plaintiffs failed to comply with the covenants by not assigning architectural control to UPI, they should be denied their injunctive remedy. We find it unsupportable. Since not all lots had been sold to individual lot purchasers at the time trial commenced, the provision requiring assignment to UPI was not operable.

We further find defendants' arguments that a court in equity is generally reluctant to enforce naked legal rights and is prone to strict construction of restrictive covenants to be unpersuasive in this case. "Application of the strict rule of construction will not be allowed to subvert the manifest intention as shown by the entire instrument in which the covenant appears." *Leverton v. Laird*, 190 N.W.2d 427, 431 (Iowa 1971), quoting *Stockdale v. Lester*, 158 N.W.2d 20, 22 (Iowa 1968). "Under the modern view, building restrictions are regarded more as protection to the property owner and the public than a restriction on the use of property, and the old-time doctrine of strict construction no longer applies." *Leverton*, 190 N.W.2d at 431, quoting *Macy v. Wormald*, 329 S.W.2d 212, 214 (Ky.1959). We agree with trial court's conclusion that, in this case, an injunction is necessary to effectuate the purpose and intent of the parties in creating the restrictions and is thus an appropriate remedy.

Defendants also argue that, since fences are not per se inconsistent with the building scheme in Echo Valley, and the only provision with which they did not comply was the proper request for permission, an order requiring removal of the fence is inequitable. We believe, however, that the provisions in the declaration were clear and reasonable. "No building or structure, nor any addition or alteration thereof shall be constructed, altered or *maintained* ... until ... approved." (emphasis added). Having failed to obtain approval, defendants cannot maintain the fence.

In summary, we affirm trial court's finding that the defendants violated restrictive covenants on the use of their property and affirm its injunctive remedy.

AFFIRMED.