**IN THE COURT OF APPEALS OF IOWA**

No. 17-0160
Filed April 18, 2018


**IN RE THE MARRIAGE OF JUSTIN MICHAEL STRONG
AND ROSE ELIZABETH STRONG**

**Upon the Petition of
JUSTIN MICHAEL STRONG,**
        Petitioner-Appellant,

**And Concerning
ROSE ELIZABETH STRONG,**
        Respondent-Appellee.
_____


        Appeal from the Iowa District Court for Calhoun County, William C. Ostlund,

Judge.


        The father appeals from the district court's modification of the parties'

dissolution decree, changing the physical care of the children to the mother.

**AFFIRMED.**


        Norman L. Springer Jr. and P. Shawn McCann of McGinn, Springer &

Noethe, P.L.C., Council Bluffs, for appellant.

        Gina C. Badding of Neu, Minnich, Comito, Halbur, Neu & Badding, P.C.,

Carroll, for appellee.


        Heard by Vogel, P.J., and Potterfield and Mullins, JJ.

**POTTERFIELD, Judge.**

Justin Strong appeals from the district court's modification of his and Rose Strong's dissolution decree, changing physical care of the parties' two minor children from Justin to Rose. On appeal, Justin argues the district court considered improper evidence in reaching its determination. He also maintains there was not a material and substantial change warranting modification and that Rose did not establish she could provide the children superior care. Rose asks that we affirm the district court's modification and award her $5000 in appellate attorney fees.

**I. Background Facts and Proceedings.**

Justin and Rose were married in 2006. They are parents to two children, J.S., born in 2004 and P.S., born in 2008. When the parties separated in 2010, Rose and the children moved from Texas to Iowa, near both Rose's and Justin's families. Justin remained in Texas.

In November 2010, the children spent the night at the home of Justin's parents in Iowa for Thanksgiving. Justin's parents notified him of the fact, and he immediately flew to Iowa, picked up the children from his parents' home, and returned to Texas, without notifying Rose he had done so. After he left with the children, Rose received a video recording from Justin, which he had filmed four days before Thanksgiving.[1] The video was several minutes in length and consisted of Justin sitting on the coach speaking to the camera; he addressed his comments directly to Rose, stating, in part:

---

[1] The video, which was introduced into evidence, is not date stamped. However, on the recording Justin states that it is November 21; we note that Thanksgiving was on November 25 in 2010.

I want to just tell on this camera that I'm sorry, because if you get this video, that means that what I have planned has gone through. And it'll eventually, you'll understand, and if you listen to me, you'll understand more….

And on that note, I want to say, that for the reason I'm telling you I'm sorry is because the kids don't belong with you, not right not now, not at this point, and I'm sorry I had to take them. I'm sorry for the bullshit, but I'm going to raise them. . . .

I mean, I got everything lined up already, and I have had. I just have to be there and seize the moment. And when I see it, I'm going to take it. And that's why I'm sorry. But I want you to watch this video and understand that it's going to suck and it's going to hurt not having the kids with you. . . .

I'd like for you to call and talk to them and have that sense of pain that I've had. A lot's going to change if you're watching this. A lot is going to change.

After returning to Texas, Justin filed for dissolution. In June 2011, he obtained a default dissolution decree, which placed the children in the parties' joint legal custody and in Justin's physical care.

The two boys and Justin moved five times (with five different school districts) residing in three different states—Texas, Wisconsin, and Iowa—between the entry of the default decree and Justin's filing of the petition to modify the decree in February 2016. When he filed the petition asking the court to increase Rose's child support, Justin and the children had settled in Iowa, approximately ninety miles from Rose.

In June, Rose filed an answer and counterclaim, asking the court to place the children in her physical care. Rose also filed a motion asking the court to appoint a guardian ad litem (GAL) to represent the minor children.

The court appointed a GAL.[2]

---

[2] Justin filed a resistance to the motion but only after the GAL was appointed.

In July, Rose filed an application and affidavit for a temporary injunction. She noted that she was in the middle of thirty days of summer visitation with the children, as provided by the decree. During the summer visitation, the oldest child, J.S., had reported to a counselor that Justin had fired a shotgun at a candle in their home, while the youngest child, P.S., was so close he was hit by the spent shell. J.S. also reported that Justin left the children home alone all day in the summer and that they were often home alone at night during the school year, going to bed before Justin returned home. J.S., who was twelve, stated he was responsible for his brother, who was eight—cooking his dinner, helping him with his homework, and getting him up in the morning to get to school on time. J.S. also reported there were times there was no food in the home and claimed he and his brother went to bed without supper one or two times each week. As a mandatory reporter, the counselor, Tessa Anderson, filed a report of child abuse with the Iowa Department of Human Services (DHS). Angela Johnston, a child protective worker with DHS, met with Rose and the children. She informed Rose she did not believe it would be safe for the children to return to Justin's home on July 18—the date their summer visitation with Rose was to end. The children's GAL made a similar recommendation.

The court granted Rose's motion for temporary injunction, leaving J.S. and P.S. in Rose's care temporarily and preventing Justin from having unsupervised visits with the children. The order noted that Justin was to file a motion to set a hearing on the temporary injunction.

In a response, Justin denied the allegations and asked the court to order the children to be seen by a specific psychologist, Dr. Robert Joneson. Rose

resisted Justin's request, noting the children were already seeing a different counselor. She stated J.S. had seen Dr. Joneson previously, had the perception Dr. Joneson "is aligned with their father," and had "reported to his current counselor that he did not disclose any of the details regarding his home life with Justin in his sessions with Dr. Joneson because Justin insisted on being present in the room during both sessions." The GAL also resisted Justin's motion.

The court ordered the children to meet with Dr. Joneson "at least on one occasion" and confirmed "said evaluation . . . should be done without the presence of both parents."

On August 24, a hearing was held on the temporary injunction.[3] During the hearing, the court admitted into evidence the child abuse assessment completed by DHS, which determined the allegations of abuse were founded for denial of critical care and failure to provide proper supervision. The same day, the GAL filed a report to the court. In it, she noted that she had met with J.S. and P.S. without Rose present. During their meeting, J.S. made similar reports as he had made to his counselor—that he was in charge of his brother after school, there is often nothing to eat in their home that they are capable of making themselves except frozen burritos, and his father rarely got home before the two boys went to bed. Additionally, both children reported they were afraid of their father and his collection of weapons; they also reported a fear of being "smacked" by their father and stated that Justin "smacks" P.S. often. The GAL recommended that the

---

[3] Although the hearing was reported, we have no record of the proceedings.

children continue to reside with Rose and begin having supervised visits with Justin.

In its written ruling, the court noted the consistent allegations made by J.S. and P.S. to their counselor, the DHS worker, and the GAL but stated it was "somewhat reticent to reach the same level of urgency." The court continued:

> In spite of what appears to be an easy decision, there is evidence to suggest that the answer may be more clouded. Specifically, Dr. Joneson, a license psychologist since 1982, testified on behalf of [Justin]. He had met with the parties on a number of occasions and it was his conclusion that the boys were in no danger and there was no risk of them being with their father. In fact, he was surprised that a founded report was entered. He found the boys to be resourceful and had concern that these allegations may be a product of Rose's manipulations.
> . . . .
> . . . [T]he court cannot overlook the fact that [Justin] has been the primary caregiver for these children for approximately the last five years. The best evidence of their care is the boys themselves and there appears to be a definite disagreement as to their wellbeing. Further, [Justin] has denied all allegations and there is no physical evidence to buttress the charges. . . . The court lacks sufficient evidence at this time to make a complete, informed decision as to the credibility of the allegations. Certainly, it merits further investigation.

The court left the children in Rose's custody temporarily pending the October trial on the merits of the modification petition and ordered that Justin was to have unsupervised visits with the boys on the weekends.

In October, the modification came on for hearing. First, J.S. spoke with the court outside the presence of his parents. He testified that he wanted to live with his mom, stating that his dad usually was not home until 8:00 p.m. or later and that he and his brother had to be in bed by 8:30. He testified that on a typical day at his dad's house, he was in charge of getting P.S. up for school, and then after school, before their father was home, they would do their homework, fix dinner,

and bathe. When asked if he felt like a parent to P.S. at Justin's house, he said, "Yes." J.S. contrasted his time at Justin's with his time at his Rose's house, stating his mother cooks for the family, so he is free to participate in activities or spend time with friends. He reiterated his allegations about his father firing a gun in their living room. In response to questions, J.S. told the court that neither parent speaks badly about the other in front of him, but his mother allows him to speak to his father whenever he wants while his father only allows him to call Rose during "this time where we can call . . . for about fifteen minutes." J.S. also testified that while he was in his mother's care over the summer, he "only heard from [his father] once."

Rose testified Justin was physically and verbally abusive during their marriage, noting Justin had 2005 Iowa convictions for domestic abuse assault (with Rose as the victim) and assault while displaying a dangerous weapon, as well as 2006 Wisconsin convictions for disorderly conduct and domestic abuse (with Rose as the victim).[4] Rose testified that since she had moved to Iowa approximately five years before, she had lived in the same town the entire time. Although she had tried to enforce her visitation with the boys once they moved to Iowa, Justin denied her requests for time with the boys "quite frequent[ly] . . . off and on until [they] went to mediation in April of 2015." Additionally, Rose testified that in 2013,

---

[4] During his testimony, Justin admitted to the convictions. However, when asked why he told the child protective worker there was no domestic violence during his marriage to Rose, Justin claimed that although he pled guilty to both domestic violence charges, no violence actually took place. We note that there is no indication in the record that Justin entered *Alford* pleas to the charges. He made a similar claim regarding his 2015 guilty plea to theft, which is also unsupported by the record.

Justin had repeatedly asked her for sexual favors in exchange for having time with the children.[5]

Tessa Anderson, J.S.'s counselor, testified at trial. She discussed the allegations J.S. had made against his father to her and the report she filed with DHS. She also testified that J.S. told her was scared to go to school "because he was afraid of going back home and having to move quickly as they've had to do multiple times." When asked if she ever got the sense that J.S. was prompted or coached to the make the allegations, Anderson answered, "No," explaining:

> The things he continued to report in the second session of therapy and sessions after were consistent. The symptoms that he talked about that we worked on were consistent with things that he reported in the sessions.
> . . . .
> The case with manipulation always ends up falling apart. They don't have much detail to it because it's not their quote unquote story to tell. They don't have emotions that match the words they say. They usually don't stick with therapy long term because the parent's afraid of it becoming found out that it's not the child's story.

Anderson also testified that J.S. had reported to her that he remembers witnessing an instance of domestic violence between his parents when they were still married, where Rose was holding P.S. and Justin shoved Rose "so hard she almost dropped" P.S.

The DHS worker who conducted the investigation of Justin's home after the abuse allegation, Kathleen Garey, testified that she met with Justin in his home "a couple weeks" after the initial report was made. Garey testified she did not observe any bullet holes in the wall and stated Justin denied having repaired any drywall

---

[5] Rose offered into evidence screenshots of text messages that she testified were between her and Justin—some which implied that she could see the kids if she would have sex with him and others where he explicitly stated as much.

before her visit. She did note that P.S. had reported Justin had pushed J.S. into the wall when he was mad at him, ultimately leaving a dent in the wall. While in the home, Garey noticed an area in the living room "where it was evident there had been a hole about three feet up the wall and about 12 inches circular spot"; Justin told her the hole was a result of his wrestling with J.S. when J.S. accidently pushed Justin into the wall.

During Justin's testimony, he denied firing a gun at a candle in his home. He denied the allegations of "smacking the kids," although he testified he has "spanked [his] kids."[6] Justin also denied preventing Rose from exercising her scheduled visitation and offering Rose visitation in exchange for sex,[7] but he admitted putting restrictions on the times when the children are allowed to speak with Rose. When asked by his attorney if he ever told Rose he did not want her to pay child support, Justin admitted telling her as much after the original decree was entered because an attorney in Texas hold told him if she failed to pay for two years, he could have her parental rights terminated and he "would rather have gone that time without child support th[e]n fully raise my children by myself the way

---

[6] This is in contrast to the statement Justin is reported as making to the DHS worker, when he denied using corporal punishment.

[7] Later, Justin was asked to comment on the following text message exchange:
> JUSTIN: So[] when do u wanna have some sex
> ROSE: So when do I get to see my kids?
> JUSTIN: I asked first
> ROSE: Never! Stop Please!
> ROSE: Can I pick my kids up tom for the weekend??
> ROSE: Yes or no????
> JUSTIN: That's up to now is't it
> JUSTIN: *Up to you*

When asked what he meant by his last statement, he testified, "If she going to come get them or it's not my decision. The paper stated she could have weekends." When asked if he was implying she had to have sex with him in order to see the children, Justin denied it then claimed he and Rose had been discussing getting back together.

I wanted to." When asked again on cross-examination about his statement to Rose regarding child support, Justin admitted, "I could have stated that a few times for the sole purpose of my own wants."

According to the parties, at the time of the hearing, Rose was currently attending classes online toward receiving a bachelor's degree in health care administration. She was taking "full-time" credit hours and anticipated completing the degree in May 2017. Rose was also employed babysitting her sister-in-law's three-year-olds at her sister-in-law's home; she earned $300 per week in that position. Justin worked full-time for a chemical sales and application company. He was "hourly, salary based," which he testified meant that he was guaranteed $38,000 each year, with the company adjusting his hours and overtime on his paystub each week to make that possible.[8] Justin was confronted with various paystubs, some of which indicated he had worked 183 hours in one two-week pay period and 131 hours in another, but he maintained that other than a twenty-one day period each year where he works twelve- or thirteen-hour days, he typically works forty or fifty hours per week and is home by 5:30 p.m. Though he testified he believed he could provide better care for the children than Rose due to his "stability," he admitted that he was on his fifth different job in his fifth location since the 2011 decree was entered. Additionally, his leaving of his previous job

---

[8] Justin was unable to testify as to how the system worked, but the court indicated it "had these type of things before, and it's one of those things where they work backwards from the salary. . . . My understanding is they can't put in the salaried at that much so they have to manipulate the hours to make it look differently."

coincided with or was close in time to his previous employer reporting him for theft and unauthorized use of a credit card.[9]

Finally, Dr. Joneson testified he had met with the boys several times—sometimes with Justin in the room and sometimes without. He opined they were both "very healthy mentally, . . . very resilient and quite normal." He testified that he had spent forty-five minutes with Rose. When asked what he believed Rose's motivation was for asking for a custody modification, Dr. Joneson testified:

> I don't know her original motivation for trying for change of custody other than she loves her kids, wants to be their mother and so forth. But at this point in time, talking about [J.S. having] PTSD and maladjustment of the children. That's—That doesn't exist. Okay? That whole part of this is—bogus. It does not exist.

Dr. Joneson also expressed "astonishment" that DHS had made a founded abuse report. He testified to his belief that Rose, who had filed a previous modification petition in 2015 and then voluntarily dismissed, "was told by her . . . previous attorney[] that there wasn't enough to go on, so they had to manufacture something." He later reiterated, "I think the boys were coached into this." He also testified that he saw no indication that the children were scared of Justin, noting that he had seen J.S. "reach over and put Justin's arm around him and snuggle into him. And this is completely relaxed and trusting of his father." In an exchange between the court and Dr. Joneson, the following occurred:

> THE COURT: Well, curiously, [J.S.] did talk to the Court before we started anything else. And my perception of him was that he was a bright, pretty eloquent young boy.
> DR. JONESON: Yes.
> THE COURT: And he didn't appear to be stressed out at least there. I'm sure he was nervous.
> DR. JONESON: Sure.

---

[9] Justin entered a guilty plea to theft in the fifth degree.

THE COURT: But he was quite certain that he wanted to live with his mom, that his dad had neglected him in the past, that he witnessed his brother getting whacked around a couple of times, that this incident did occur, that he loved his dad but he—he was tired of having to take care of himself and his brother in his dad's absence, and that's taking this to a pretty—big degree to fabricating of these things if isn't true.

DR. JONESON: Those aspects, Your Honor, I believe that's true. I believe that he's had to cook supper sometimes when his dad isn't there and—

THE COURT: Yes.

DR. JONESON: So, those things I believe to be true. The discharge of the weapon in the home, no. I don't believe.

In its written ruling, the court modified the original dissolution decree to give Rose physical care of the children. In doing so, the court stated:

While the Court is somewhat limited in evidence pre-decree, there appears to be a consistent theme of improper behavior on behalf of Justin subsequent to the divorce. Justin's record would reflect that there were founded domestic abuse allegations prior to the dissolution and subsequent violation of the law post-dissolution. While Justin has seemingly indifferent explanations for these incidents, the Court cannot avoid factoring this in when weighing the credibility of [Justin].

. . . .

. . . In analyzing the circumstances, the Court first directs its attention to the manner in which the initial decree was entered. [Justin] surreptitiously took the children to Texas and took advantage of this venue to the extreme detriment of [Rose]. She stated that she was unable to secure counsel and expense limited her ability to defend. Thus, the default decree was entered. Further, while circumstances that may have occurred prior to the entry of the decree, normally not considered, the Court may take notice of them when they represent a form of consistent behavior on either party. The existence of prior domestic abuse may give credence to the allegations of the children witnessing abuse, not only to their mother, but to them. Further, Justin has demonstrated a disdain for obedience to the law in his criminal activities.

. . . .

. . . While the Court believes that the allegations of the Founded Child Abuse Assessment are somewhat arguable, the Court believes that the consistency in the details as reported by the boys cannot be ignored. Further, the Court found J.C.S. to be a forthright, candid, and unpressured young boy. Thus, the Court determines that the allegations *in toto* are alarming and must be

considered. Further, the boys have expressed a clear preference to be with Mom. The evidence would establish that they are living in a more-than-adequate home, have established new friends, and are engaged in activities that they may not have had in the past. In addition, the Court has found there to be consistent evidence of abuse not only to Rose but to the boys all contributing to a potentially dangerous and stressful situation. Finally, the Court believes that the evidence suggests that Rose would be more likely to provide a more stable environment and would likely promote more meaningful and beneficial contact between the parties than with Justin. Further, the supervision by Rose appears to be superior to that of Justin. Finally, the Court cannot overlook its perception of the credibility of the parties in reaching its ultimate conclusion.

Justin appeals.

## II. Discussion.

### A. Evidentiary Rulings.

Justin maintains the court considered improper evidence in reaching its determination. Specifically, he argues the court should not have considered the report from the GAL, the founded child abuse assessment, and evidence presented regarding the temporary injunction. Modifications of dissolution decrees are tried in equity. *See In re Marriage of Trickey*, 589 N.W.2d 753, 756 (Iowa Ct. App. 1998). "The rule of evidence in equity cases is that the trial judge, while noting objections, may not exclude offered evidence." *United Properties, Inc. v. Walsmith*, 312 N.W.2d 66, 73–74 (Iowa Ct. App. 1981). However, "[t]o the extent the parties challenge the court's ruling on the admissibility of evidence, we review for the correction of errors at law." *Garland v. Branstad*, 648 N.W.2d 65, 69 (Iowa 2002). We consider each of Justin's claims in turn.

*GAL's Report.* The district court refers to the report of the GAL in the factual portion of its decree, saying, "The Guardian ad Litem recommends that the boys be placed with Rose. The Guardian ad Litem has filed a detailed report

encompassing the investigation and conclusions." There is no other reference to the report in the ruling; the report was not admitted at trial. but had been filed at the time of the hearing on Rose's application for temporary injunction.

Justin argues the court should not have considered the GAL's report; he relies on *In re Marriage of Joens*, 284 N.W.2d 326, 329 (Iowa 1979), in which our supreme court stated the role of the GAL "is to investigate and secure the testimony of witnesses helpful to the cause of the children. There is no provision that he 'report' or that he make recommendations. His findings are not made admissible as evidence in this case." In response, Rose maintains that Justin has failed to preserve error on the issue.

Here, the GAL's report was never offered at trial. Although it had been previously filed with the court before the temporary hearing, neither party asked the trial court to take judicial notice of the previous filing. Thus, Justin did not have an opportunity to object to the court's reference to the report in reaching its decision in the modification proceeding before the court issued its ruling. While Rose argues Justin should have filed a motion to strike the report if he did not want it to be considered (and wanted to preserve error on his claim), such a determination would be unfair to Justin. Our case law has established that the court is to consider such a report only "when properly before the court by agreement or stipulation."[10]

---

[10] Although the change to the statute became effective after the trial in this case, we note the change to Iowa Code section 598.12 (2017), which provides, in part:

> The guardian ad litem may cause witnesses to appear, offer evidence, and question witnesses on behalf of the best interests of the child. The guardian ad litem may offer proposed or requested relief and arguments in the same manner allowed the parties by the court. *However, the guardian ad litem shall not testify, serve as a witness, or file a written report in the matter.*

Iowa Code § 598.12(1)(a)(6) (emphasis added).

*Joens*, 284 N.W.2d at 329. Nothing in the record suggests such an agreement or stipulation had been reached in these proceedings. In fact, Justin had objected to the GAL's appointment—albeit after she was already appointed.

The court did not rely on the report in its decree and did not cite any details provided by the GAL. Insofar as statements or allegations in the GAL's report were unique to the report—not testified to by witnesses at the modification hearing or contained in properly admitted evidence—we review the modification of physical care without considering that evidence. *See In re Marriage of Williams*, 303 N.W.2d 160, 163 (Iowa 1981) (noting the district court should have sustained the father's objection to a child-custody report as hearsay; "[b]ecause our review is de novo, we disregard the report in our consideration of the issues"); *Erickson v. Blake*, No. 15-0251, 2016 WL 1130578, at *1 (Iowa Ct. App. Mar. 23, 2016) ("To the extent any evidence was improperly considered by the district court, reversal is not required given our de novo review of the record on appeal.").

*Founded Child Abuse Report.* Justin asserts that the district court should not have considered the founded child-abuse report, claiming such a report—like the GAL's report—contains "untested hearsay which the court ought not accept in lieu of sworn testimony before deciding an issue as important as child custody."

Though Justin analogizes the GAL's report and the founded child abuse report, Justin had the opportunity to object to the admission of the child abuse report and failed to do so. When Rose moved to admit the exhibit—while the DHS worker who authored the report testified—the following took place:

> JUSTIN'S ATTORNEY: May I voir dire for the purpose of—
> THE COURT: Yes.
> . . . .

> JUSTIN'S ATTORNEY: Do you know whether or not Justin has appealed the findings?
>
> WITNESS: Yes, he has, sir. I was notified recently that there is an appeal filed with the state which everyone has a right to do that.
>
> JUSTIN'S ATTORNEY: Yes. And until there's a final adjudication regarding this case, it may or may not stand [as] a founded complaint. Would you agreement with me?
>
> WITNESS: At this point, sir, it is a founded complaint.
>
> . . . .
>
> JUSTIN'S ATTORNEY: Okay. That doesn't mean it's going to remain founded; it just stays that way until there is a final ruling.
>
> WITNESS: There will be a final ruling from the attorney general's office.
>
> JUSTIN'S ATTORNEY: With that understanding, I have no objection to the exhibit, Your Honor.

Because Justin failed to object to the admission of the evidence, his claim of error regarding the founded child abuse report has not been preserved. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

*Evidence from Earlier Proceedings.* Justin makes a conclusory statement that the district court "should not have considered any evidence presented in obtaining the 'Removal Order' or 'Order Regarding Temporary Matters.'" He does not point to any such evidence that was improperly considered nor does he cite to any legal authority to support his claim. We do not consider this claim further. *See Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("[W]e will not . . . search for legal authority and comb the record for facts to support such argument. Consequently, any error by the trial court . . . was not preserved for our review."); *see also* Iowa R. App. P. 6.903(2)(g)(3).

**B. Substantial Change in Circumstances Warranting Modification.**

The requirements to change a custodial provision are well-settled:

To change a custodial provision of a dissolution decree, the applying party must establish by a preponderance of evidence that conditions since the decree was entered have so materially and substantially changed that the children's best interests make it expedient to make the requested change. The changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary. They must relate to the welfare of the children. The party seeking to take custody from the other must prove an ability to minister more effectively to the children's well-being.

*In re Marriage of Downing*, 432 N.W.2d 692, 694 (Iowa Ct. App. 1988) (quoting *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983)). We review the modification proceedings de novo. *See In re Marriage of Walters*, 575 N.W.2d 739, 740 (Iowa 1989).

Here, Justin claims the district court should not have modified the physical care of the parties' children because there had not been a substantial change in circumstances warranting modification since the original decree was entered.

As the district court noted, the record contains limited evidence of the parties' circumstances before the dissolution decree was entered. Additionally, because the initial decree was a default decree, we have a lack of factual findings or support for the original provision of physical care to Justin. Still, our de novo review of the record supports the district court's determination that a change in physical care was warranted because Justin is not supportive of the children's relationship with Rose. *See Downing*, 432 N.W.2d at 694.

Even without considering his initial use of surreptitious means to remove the children from Rose's care, Justin testified he told Rose after the decree was entered that he did not want her to pay the court-ordered child support and admitted he did so because he hoped to cultivate the grounds to have her parental

rights terminated. Since being awarded physical care of the children, Justin has, at times, denied Rose's scheduled visitation with the children. He has also abused his power as the children's primary caregiver with attempts to coerce Rose into having sexual relations with him, stating she could have time with the children if she did so. Furthermore, J.S. testified that Justin limits the amount of time they may speak to their mother while they are in his care.

Based on the manner in which the children came to be in Justin's care and the dissolution decree was entered, we believe it is safe to say there was a certain amount of dysfunction in these parents' ability to communicate and co-parent at the time the decree was entered. But such a fact does not forestall a determination that Justin's later decisions to undermine Rose's relationship with the children can be the triggering event for modification. *See In re Marriage of Walters*, No. 11-1746, 2012 WL 2411183, at *3 (Iowa Ct. App. June 27, 2012) ("One parent's actions which undermines the children's relationship with the other parent can be the triggering event for modification."). In *Downing*, this court discredited the mother's argument that the problems the parents were facing at the time of modification were the same they were facing at the time of dissolution, noting, "When entering the original decree, the court no doubt understood certain natural animosities exist during a divorce, however it strains credulity to believe the trial court did not contemplate the parties, mature adults, overcoming these feelings to concentrate on the best interests of their [children]." 432 N.W.2d at 694. Similarly, in *In re Marriage of Grabill*, 414 N.W.2d 852, 853 (Iowa Ct. App. 1987), our court held that the custodial parent's lack of cooperation with the noncustodial parent's

efforts to maintain satisfactory communication and visitation with the children constituted a substantial change in circumstances.

We agree with the district court that a substantial change in circumstances warranting modification exists.

**C. Superior Care.**

Justin claims that Rose has not met her "heavy burden" of establishing that she can provide the children with superior care than he can. We disagree.

When the children were in Justin's care, J.S.—who was twelve at the time of the modification hearing—was responsible for much of the parenting responsibilities of eight-year-old P.S. J.S. testified he was responsible for getting P.S. up in the morning and making sure they got on the school bus. After school, J.S. was in charge of helping P.S. with his homework, cooking an evening meal, and ensuring P.S. bathed. In contrast, because Rose was attending school online and providing in-home daycare for her sister-in-law's children, she was able to take the children to and from school and cook all of the family's meals.

Additionally, Rose has established that she can provide the children with more stability than Justin can. Though Justin testified he had "met [his] match with moving" and would be staying in the area, his historical practice of frequent moves leads us to question his claim. Justin and Rose moved four times during their marriage. In the five years after their marriage ended before the modification trial, Justin moved an additional five times, while Rose remained in Iowa. Though the children had managed to do well in school in spite of their frequent moves, the change was not without effect; J.S.'s counselor testified he had expressed fear "of going back home and having to move quickly as they've had to do multiple times."

While Justin continued to dispute J.S.'s persistent claims that Justin neglected J.S. and P.S.,[11] it is apparent Justin neglected the children's dental care needs. Rose testified that in 2015, P.S. came to her crying and indicated his "bad teeth" got bumped. When she looked into his mouth, she saw that he had a tooth abscess. Rose took P.S. to the dentist, who then removed the tooth and instructed Rose that the children needed to be seen "more frequently"—every six months—to prevent such things from occurring again. Rose testified she told Justin about the dentist's instruction and he stated he would take them. However, when Rose took J.S. and P.S. back to the dentist when they were in her care in the summer of 2016, the dentist determined that P.S. had ten cavities and J.S. had four. When asked about the children's dental care, Justin testified he took the boys to the dentist in 2013, but "2014 and the next prior years [Rose] had taken it upon herself during her visitation to take care of that." Justin's implication that Rose wished to take over the children's dental care strains credulity, as her time with the children was limited to only a few days per month, with all of those days taking place on weekends.

Based on the foregoing, Rose has established that she can provide the children with superior care. Thus, we affirm the district court's modification of the parties' dissolution decree, placing J.S. and P.S. in Rose's physical care.

### D. Appellate Attorney Fees.

---

[11] We note that even Justin's witness, Dr. Joneson, testified that he believed many of J.S.'s statements—"that he wanted to live with his mom, that his dad had neglected him in the past, that he witnessed his brother getting whacked around a couple of times, . . . that he loved his dad but he—he was tired of having to take care of himself and his brother in his dad's absence"—were true.

Rose requests that we award her $5000 in appellate attorney fees. An award of such fees is discretionary. *See Spiker v. Spiker*, 708 N.W.2d 347, 360 (Iowa 2006) (considering the award of appellate attorney fees in a modification action). "Factors to be considered in determining whether to award attorney fees include: 'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.'" *Id.* (quoting *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005)). At the time of the modification trial, Justin earned $40,000 annually, while Rose earned $15,000 annually.[12] Additionally, Rose has been successful on appeal. Thus, we award her $5000 in appellate attorney fees.

## III. Conclusion.

Considering only the evidence properly before the district court, we find that a substantial change in circumstances warranting modification has occurred and Rose established that she can provide the children with superior care. Additionally, we award Rose $5000 in appellate attorney fees. We affirm.

**AFFIRMED.**

---

[12] We acknowledge that Rose stipulated, for the purpose of calculating child support, that her earning capacity was $30,000 annually. As we do not believe the use of her earning capacity accurately reflects her needs; for the purposes of whether to award appellate attorney fees, we consider her actual earnings.